**Helen PTASHKIN, by and through her attorney and legal counsel, Harold N. FLIEGELMAN, Esquire, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 11, 1999.
Decided May 26, 1999.

---

David L. Narkiewicz, Montgomery, for petitioner.

Andrew A. Coates, Philadelphia, for respondent.

Before FRIEDMAN, J., LEADBETTER, J., and MIRARCHI, Jr., Senior Judge.

MIRARCHI, Jr., Senior Judge.

Helen Ptashkin, by and through her attorney and legal counsel, Harold N. Fliegelman, Esquire, petitions this Court to review a final administrative order of the Pennsylvania Department of Public Welfare (DPW) affirming a hearing officer's decision to deny her appeal of a decision of the County Assistance Office (CAO). The CAO denied Ptashkin's application for medical assistance (MA) benefits. We affirm.

The essential facts are undisputed. Ptashkin, who was born on June 27, 1916, is a resident of Rosemont Manor Nursing Home in Rosemont, PA. She had been receiving MA benefits for her care in that facility until they were terminated on May 1, 1997 as a result of a failure to provide requested income/resource verification to DPW. The information was requested because DPW had received information that Ms. Ptashkin's husband (who was living in the community in the family home) had died, prompting DPW to inquire whether Ptashkin would be receiving any income or assets.

As a result of Mr. Ptashkin's death, the family home was sold on May 23, 1997. On May 30, 1997, Ptashkin's two sons each executed a non-negotiable promissory note payable to Ptashkin, apparently in exchange for the proceeds of the house sale. One note, executed by Henry Ptashkin as "Borrower," promised to pay Helen Ptashkin ("Lender") the principal sum of $10,307.50 with interest at a rate of 8% and an additional "premium" of 2% on the unpaid balance. The note provided for payments to Ptashkin of $17.18 per month commencing June 1, 1997, until a balloon payment of $10,307.50, plus any accrued interest or premium, was payable at the maturity date of June 1, 2006. The note cancelled, however, upon the death of Helen Ptashkin, should this event occur prior to the maturity date, relieving the "Borrower" of any further obligation to tender payment. The second note, from Jeffrey Ptashkin ("Borrower") to Helen Ptashkin ("Lender"),

provided for identical terms except for the amounts payable. Jeffrey Ptashkin promised to pay his mother $18,507.50 in monthly installments of $30.85 until the maturity date of June 1, 2006 when a balloon payment of $18,507.50, plus any accrued interest or premium, was due and owing. This note also cancelled in the event of Helen Ptashkin's death prior to the maturity date.

On August 25, 1997, a new application for MA benefits for Ptashkin was received by the CAO. Among the documents included in the application were copies of the two promissory notes and a document entitled "Conceptual Plan" prepared by Ptashkin's legal representative, which outlined the steps the Ptashkin children were taking to avoid Medicaid estate recovery. Thereafter, the CAO sent Ptashkin notice that she was ineligible for MA because she was deemed to have available resources in excess of the regulatory $2400. In coming to the determination that Ptashkin had available such resources, the CAO concluded that the $28,815 purportedly borrowed by her sons, as evidenced by the two promissory notes described above, was transferred for less than fair consideration within thirty-six months from the application date for MA. Thus, under DPW regulations, this amount was considered an available resource to Ptashkin.[1] Ptashkin appealed, and a hearing was held before a hearing officer.

DPW presented the testimony of the income maintenance caseworker and the DPW legal counsel who reviewed and made the decision to reject Ptashkin's MA application. Ptashkin presented no witnesses. The hearing officer determined that Ptashkin failed to rebut DPW's presumption that the funds were transferred to Ptashkin's sons for less than fair market value and to qualify for MA. Accordingly, the hearing officer denied Ptashkin's appeal. The Bureau of Hearings and Appeals affirmed the hearing officer, and this appeal followed.

■ This Court's scope of review is limited to a determination of whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, and whether constitutional rights were violated. *Oriolo v. Department of Public Welfare*, 705 A.2d 519 (Pa.Cmwlth.1998). Ptashkin argues several issues on appeal: (1) whether Ptashkin received fair market value in exchange for the "loans" to her sons; (2) whether the hearing officer erred "by basing her decision on an impermissible presumption instead of making a factual determination whether Mrs. Ptashkin received fair market value in exchange for her loans"; (3) whether the hearing officer improperly applied existing law; and (4) whether the hearing officer attempted to apply a MA eligibility standard more restrictive than that permitted by federal law. To address these issues, a review of the Medicaid law and applicable DPW regulations is in order.

"The Medicaid program was established in 1965 in Title XIX of the Social Security Act [42 U.S.C. §§ 1396–1396r] to provide federal financial assistance to states that choose to reimburse certain costs of medical treatment for needy persons." *Oriolo*, 705 A.2d at 520. Coverage may be provided for those described as the "medically needy," whose income and resources are insufficient to meet necessary medical costs. 42 U.S.C. § 1396A(a)(10)(c). States providing such coverage must establish eligibility standards for the medically needy. 42 U.S.C. § 1396A(a)(17). In Pennsylvania, Section 442.1 of the Public Welfare Code[2] authorizes DPW to establish such standards. DPW's duly promulgated regulations provide that an applicant is eligible for medically needy MA benefits if the applicant has available resources of $2400 or less. 55 PA Code § 178 (App. A).

---

**1.** *See* 55 Pa.Code § 178.104.

**2.** Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. § 442.1. Section 442.1 was added by Section 5 of the Act of July 31, 1968, P.L. 904.

DPW, however, is the payer of last resort. 55 Pa.Code § 178.6(a). It is incumbent upon an applicant to use his or her own resources, until they are reduced to $2400, prior to applying for MA. Such resources are defined as "[r]eal or personal property which a person has or can make available for partial or total support." 55 Pa.Code § 178.2.

Provisions have been made to insure that an applicant does not improperly dispose of otherwise available assets in order to qualify for MA and pass the costs of his or her medical care onto the taxpayers. For transfers made by an applicant on or after July 30, 1994, DPW regulations at 55 Pa.Code § 178.104, based upon the federal law, provide in pertinent part:

(a) If assets are disposed of on or after July 30, 1994, §§ 178.105 and 178.106 (relating to presumption of disposition of assets to qualify for MA for transfers on or after July 30, 1994; and reestablishment of MA eligibility after transfers made on or after July 30, 1994) and this section apply to an institutionalized individual who is applying for or receiving MA for NFC [Nursing Facility Care] ... and the individual or the individual's spouse transfers assets for less than FMV [Fair Market Value].

(b) An institutionalized individual who disposes of assets for less than FMV on or after the look back date in subsection (c) is ineligible for MA for NFC.... The transfer of assets by the community spouse to a person other than the institutionalized spouse is treated and affects the eligibility of the institutionalized spouse the same as a transfer by the institutionalized spouse.

(c) The look-back date shall be 36 months from the date on which the individual is both institutionalized and has applied for MA....

(d) The number of months of ineligibility for the institutionalized individual who disposes of assets for less than FMV shall be equal to the total cumulative UV [Uncompensated Value, as defined by 55 P.S. § 178.2] of all assets transferred by the individual or the individual's spouse on or after the look-back date divided by the average monthly cost to a private patient of NFC in effect in the Commonwealth at the time of application.

(e) An individual will not be ineligible for payment for NFC if:

. . . .

(3) The individual, the individual's spouse or someone else acting on behalf of the individual can show that one of the following applies:

(i) The individual intended to dispose of the assets either at FMV or for other valuable consideration.

(ii) The assets were transferred exclusively for a purpose other than to qualify for MA.

(iii) The assets transferred for less than FMV were returned to the individual.

Ptashkin essentially argues two things. First, that the promissory notes demonstrate that she had made transactions with her children for fair consideration, thus prohibiting a finding that she is ineligible for MA pursuant to Section 178.104(e)(3)(i). Second, that DPW may not apply a presumption of improper motive or that the transfer was for less than fair market value unless DPW comes forth at the hearing with proof that the transfer of assets was made for less than fair market value, pursuant to Section 178.104(a). We disagree.

■ It is abundantly clear, under statute, regulation, and case law, that the applicant fully bears the burden of proving eligibility for MA. This Court previously stated:

Although there is no constitutional right to receive public assistance ... a person who is medically needy is statutorily eligible for MA. This Court has recognized our legislature's legitimate interest in allocating undeniably scarce

social welfare resources to those considered most needy.... The burden of proving eligibility for assistance rests with the applicant....

*Stanley v. Department of Public Welfare,* 112 Pa.Cmwlth. 157, 535 A.2d 674, 677 (1987) (citations and footnote omitted). "[I]t is the applicant's responsibility to establish eligibility, not" DPW's. *Swartz v. Department of Public Welfare,* 697 A.2d 588, 592 (1997).

The Public Welfare Code specifically places the burden upon the applicant to demonstrate that transactions made prior to application for MA were bona fide and for fair market value:

> Any person applying for medical assistance benefits shall certify to the department that he or she has not transferred title to or ownership interests in any real or personal property to any third party within the two years immediately preceding such application; if such a transfer has occurred, the recipient must disclose the nature of the transfer and must demonstrate that it involves, a bona fide arm's length transaction resulting in compensation paid to the transferor in an amount equal to or greater than the fair market value of the property as determined by the department.

62 P.S. § 1404(a). We have applied this section in reviewing the eligibility of an applicant for MA after the applicant made transfers of assets (that would otherwise be available for the applicant's medical care) to her children within the requisite time frame. *Breitkreutz v. Department of Public Welfare,* 699 A.2d 1378 (Pa.Cmwlth. 1997).

Moreover, the very regulatory provisions relied upon by Ptashkin squarely place the burden on the applicant to establish that he or she "intended" to dispose of the assets for fair market value or for other valuable consideration, or that the assets were transferred "exclusively" for a purpose other than to qualify for MA. 55 Pa.Code § 178.104(e)(3).

In addition, DPW may presume that a transaction, that was made during the thirty-six month look-back period set forth in Section 178.104(c), was made for less than fair market value or for a purpose to dispose of the assets in order to qualify for MA. 55 Pa.Code § 178.105. If DPW makes this presumption, the applicant will be notified in writing and will have an opportunity to rebut the presumption by providing documentary and nondocumentary evidence, which evidence may include information pertaining to: (1) the purpose for transferring the assets; (2) the attempts to dispose of the assets at fair market value; (3) the reasons for accepting less than fair market value; (4) the means of, or plans for, self-support after the transfer; and (5) the applicant's relationship to the person to whom the assets were transferred. 55 Pa.Code § 178.105(c). If the presumption is not rebutted, the presumption stands that the assets were transferred for the purpose of qualifying for MA. In such a case, the applicant shall become ineligible for MA for the period of months resulting equal to the product of the value of the transferred assets divided by the average monthly cost to a private patient for nursing home care then in effect in Pennsylvania. 55 Pa.Code § 178.104(d).

What is clear from DPW's regulations is that DPW is empowered to make its presumption prior to a hearing, and that the burden will be upon the applicant to rebut the presumption at the hearing, if not before. We have previously noted with approval this procedure in *Breitkreutz.* Further, the regulations define "rebuttable presumption" as follows:

> A rule of evidence which permits the Department to assume that when certain facts are true, other facts are true, without having proof of those other facts. The presumption is automatic, and can be disproved or rebutted only by the applicant/recipient presenting evidence at a prehearing conference or a

Departmental fair hearing. If the applicant/recipient presents no evidence at the prehearing conference or at the fair hearing to disprove the presumption, the presumption remains unrebutted and stands.

55 Pa.Code § 178.2.

Ptashkin's argument that DPW was required by Section 178.104(a) to present proof that the transfer of assets was for fair market value or for the purpose of qualifying for MA is thus contradicted by the regulations as a whole, as well as by statute and case law.[3] Ptashkin's position would improperly compel DPW to shoulder the burden of proving the applicant ineligible. To require DPW to set forth evidence that a transfer of assets was made for less than fair market value, or for the purpose of rendering the applicant eligible for MA, would result in more than the creation of a presumption—this evidence would be the very case itself. Moreover, even if DPW did not enjoy the presumption it may make under the regulations, the very regulations Ptashkin relies upon makes it clear[4] that the applicant has the burden to show that the transfer of assets was for the purpose of making a fair market exchange or was not intended to qualify the applicant for MA. 55 Pa.Code § 178.104(e)(3).

At the hearing, DPW presented thorough testimony concerning the reasons it rejected Ptashkin's application for MA. DPW had discovered that Ptashkin had sold her home and received net proceeds in the amount of $28,815. DPW then learned that Ptashkin, instead of applying these funds for her nursing home care[5], transferred them to her adult children in exchange for two promissory notes. DPW then reviewed the promissory notes and concluded that the transaction did not appear to be a fair market exchange. As DPW's counsel testified at the hearing with regard to the loan to Jeffrey Ptashkin:

> Basically, Mrs. Ptashkin transferred these funds and [is] getting the return back of $30 a month on $18,500. It is extremely de minimis as far as the amount of money that's involved regarding her transfer. She's divested herself of the use of $18,500 worth of principal in return for receiving back $30 a month, $30.85 a month. This $30.85 a month would be payable every month until the year [sic] of June 1, 2006. If a person's not going into a nursing home, just the average-day person on the street, they would never make a transfer like this. There is no way you would transfer $18,000 to receive back $30 a month and expect to get a balloon payment at the end of nine years for the value of the $18,500 plus interest. You've divested yourself of the use of the principal. That would be a transfer for less than fair consideration.

Notes of Testimony (N.T.) at 39–40. This analysis was applied to the similar loan to Henry Ptashkin. N.T. at 45.

Regarding Ptashkin's use of life expectancy tables as the framework for the term of the loans, DPW's counsel testified as follows:

> We have requested in the past, and will continue to do so in the future, that if we have anything that comes up regarding actuarial tables, we require documentation to provide to us a knowledge that the individual who is going to use these

---

**3.** It has been noted that because the Medicaid Act contains such complex, interrelated provisions, it would be "foolhardy to impute a plain meaning to any of its provisions in isolation." *Cleary v. Waldman*, 959 F.Supp. 222, 228–29 (D.N.J.1997). The statute and regulations must be read as a whole with the intent of the legislation in mind. *Id.* Ptashkin essentially desires that we read certain portions of 55 Pa.Code § 178.104 in isolation.

**4.** As if statute and case law were not enough.

**5.** Again, DPW is the payer of last resort. 55 Pa.Code § 178.6(a). The applicant is expected to use his or her resources, including those available from third-party liability sources, to the fullest extent before payment is made by MA. 55 Pa.Code §§ 178.4; 178.5(a).

tables does not suffer from any kind of debilitating or terminal condition that would severely [a]ffect what the anticipated life expectancy would be.

N.T. at 39. DPW's witness also testified that the transactions appeared to have the intent to avoid what was referred to as the "Medicaid Estate Recovery Act"[6] as well as DPW regulations regarding transfers for less than fair consideration. N.T. at 45.

Additionally, DPW introduced into evidence the internal memorandum written by Ptashkin's attorney to another person in his office, that was sent to the CAO with Ptashkin's application for MA.[7] Exhibit C–1. This document states in pertinent part:

Because Mrs. P is in bad shape and family is trying to avoid Medicaid estate recovery, house has been sold to Jeff in exchange for SCIN [the self-canceling promissory note]. ... When the house is sold to Jeff in exchange for SCIN, Mrs. P Will astill [sic] be eligible for MA and Jeff will have the money. He then can split it up any way he wants with his brother....

In response to DPW's evidence at the hearing, Ptashkin presented absolutely no evidence other than the promissory notes themselves. Although DPW clearly set forth the basis for its determination (and presumption) that Ptashkin transferred assets for less than fair market value and for the improper purposes of qualifying Ptashkin for MA and avoiding "Medicaid estate recovery," Ptashkin rested on (1) the mistaken belief that DPW shouldered the burden of proof and (2) the strength of the terms of the promissory notes themselves. Ptashkin argued below, and now continues its argument before us, that the promissory notes, by their terms, demonstrate that

the transfer of assets were for fair consideration.

This argument is based on (1) the premise that the term of the notes coincides with the actuarial life expectancy of Ptashkin in accordance with DPW guidelines, (2) the fact that the alleged rate of interest is 8%, and (3) the fact that Ptashkin will allegedly receive an additional 2% interest in consideration for the cancellation clause in the notes that becomes effective at her death. Ptashkin described the transaction in her brief in this manner:

The loans contain an element of uncertainty. If Mrs. Ptashkin dies before the maturity date, she may have a 'so-so deal' depending on when she dies. If Mrs. Ptashkin does not die before the maturity date, she will have a 'great deal.' In any event, she will have a 'good deal.'

Ptashkin's Brief, p. 6.

We find this argument wholly unconvincing. First, there is no objective evidence concerning Ptashkin's actual condition, which necessarily affects any consideration of life expectancy. In this regard, Ptashkin had been a resident of a nursing home for over one and one-half years prior to the application for MA at issue herein. Thus, Ptashkin had declined in health to a point that she required the presence of twenty-four hour skilled nursing care. In the internal memorandum of Ptashkin's legal representative, on the other hand, was the admission that Ptashkin's condition was "bad." The obvious belief of Ptashkin's counsel was that Ptashkin would die before the term of the notes and that the children were free to dis-

---

**6.** Section 15 of the Act of June 16, 1994, P.L. 319, *as amended*, 62 P.S. § 1412. This section provides that DPW shall implement an estate recovery program to recover the amounts paid for MA from the probate estates of persons fifty-five years of age or older who *have received MA for, among other things,* nursing home costs.

**7.** Although Ptashkin objected to the introduction of this document at the hearing, Ptashkin has not pursued that objection before us by arguing that the hearing officer erred in her evidentiary ruling. Any objection is therefore waived.

pose of the money as if they owned it free and clear.

Second, even if Ptashkin would survive to the term of the loans, these "loans" do not in the slightest resemble a fair market transaction as defined by DPW's regulations. Fair market value is defined as "[t]he price which property can be expected to sell for on the open market or would have been expected to sell for on the open market in the geographic area in which the property is located." 55 Pa.Code § 178.2. Here, Ptashkin is purportedly investing approximately $28,815 to receive a monthly return of approximately $48 per month for nine years until she receives the principal, plus accrued interest, in a lump sum just as she is expected to die. Of course, if she dies before the term of the loans, she has divested herself of a large amount of money for such a slight amount of monthly income that it is inconceivable how it would provide her any material benefit.

To further illustrate the absurdity of characterizing this transaction as a fair market exchange, it must be observed that the total monthly return of $48 is only a fraction of the stated interest rate of 8%, allowing for the possibility that the extra 2% premium is to be paid at the term of the loan. An 8% return on the $10,307.50 loan would yield a monthly interest payment of $68.74; a 10% return would yield a monthly interest payment of $85.89. Ptashkin is receiving $17.18 per month on

this loan. An 8% return on the $18,507.50 loan would yield a monthly interest payment of $123.38; a 10% return would yield a monthly interest payment of $154.22. Ptashkin is receiving $30.85 per month on this loan. Thus, Ptashkin is surrendering her principal for nine years on unsecured loans and is not even receiving a full monthly interest payment in the interim.

■ In sum, this does not appear to be a "great deal" or even a "so-so deal"; it appears to be an absurd deal.[8] On the face of these transactions, it is not apparent how Ptashkin will receive any real benefit or consideration from the transfers (aside from the solace of transferring assets to her adult children, which is not itself alone a protected transaction under the Medicaid law). At any rate, it was Ptashkin's burden to show that these transactions were for fair consideration or not for the purpose of qualifying for MA. The terms of the notes by themselves do not satisfy this burden.[9]

■ Finally, Ptashkin argues that DPW is applying conditions more stringent than those permitted by the federal Medicaid law by applying a presumption that the transfers were for less than fair market value. The federal law upon which DPW's regulations were based, however, clearly places the burden upon the applicant to prove that the applicant intended to dispose of the assets for fair market value or

---

8. We also note that there is nothing in the record indicating that Ptashkin herself is even aware of these transactions. There is no loan agreement with her signature. There is no evidence that any individual is acting on her behalf in accordance with a duly executed power of attorney. The payments from the notes are to be delivered to what appears to be the home address of one of the sons.

9. Section 178.104(e)(3)(i) provides that an applicant will not be ineligible for MA as a result of a transfer of assets if the applicant can show that he or she intended to dispose of the assets either at fair market value or "for other valuable consideration." DPW regulations do not define "valuable consideration." "Fair consideration" is, however, defined as "[c]ompensation in cash or in kind which is

approximately equal to the FMV of the transferred property." 55 Pa.Code § 178.2. "Valuable consideration" has been defined under general contract law as "some right, interest or benefit to one party or some loss, detriment or responsibility resulting to the other party." *PNC Bank, National Ass'n v. Balsamo*, 430 Pa.Super. 360, 634 A.2d 645, 655 (1993). Here, Ptashkin argued exclusively that the "loans" were made for fair market value, but failed to present evidence in support of this argument. The evidence of record, however, does not support a finding that $28,815 was transferred for valuable consideration. On the contrary, the evidence suggests that what actually occurred here was the bestowal of a gift.

exclusively for a purpose other than to qualify for MA.[10] 42 U.S.C. § 1396p(c)(2)(C). Ptashkin's burden at the hearing was nothing more than that required under federal law.

Also, federal law does not prohibit a state from rejecting a MA application if it suspects that available assets are being sheltered in contravention of the Medicaid law or its aims or purposes. In fact, it is the state's duty to perform this task. 42 U.S.C. § 1396(a). The state is empowered to make "reasonable standards ... for determining eligibility" for MA. 42 U.S.C. § 1396(a)(17). Further, it is recognized that states are granted great latitude and flexibility in carrying out the administration of federal welfare laws, given that Congress cannot prescribe every detail for implementing welfare programs. *Miller v. Ibarra*, 746 F.Supp. 19 (D.Colo.1990). DPW's regulatory permission to make a "presumption" that activity has occurred in violation of the Medicaid laws simply stems from its obligation under federal law to reject a MA application that appears to contravene the Medicaid laws. Ptashkin has failed to identify anything in federal law that prohibits the state from rejecting a MA application where otherwise available assets have been transferred in what appears to be a less than fair market exchange.

As Ptashkin failed to carry her burden of proving her eligibility for MA by showing that the disputed funds were transferred for fair market value or exclusively for a purpose other than to qualify for MA, DPW's final administrative order is affirmed.

### *ORDER*

AND NOW, this 26th day of May, 1999, the order of the Pennsylvania Department of Public Welfare in the above-captioned matter is hereby affirmed.

---

10. DPW's regulations, of course, mirror these provisions at 55 Pa.Code § 178.104(e)(3).