**Margaret BIRD and H. Paul Bird, Petitioners,**

v.

**PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 11, 1999.

Decided June 3, 1999.

David L. Narkiewicz, Montgomeryville, for petitioners.

Lesley Smith Oakes, Philadelphia, for respondent.

Before FRIEDMAN, J., LEADBETTER, J., and MIRARCHI, Jr., Senior Judge.

MIRARCHI, Jr., Senior Judge.

Margaret Bird and H. Paul Bird, wife and husband, petition this Court to review a final administrative order of the Pennsylvania Department of Public Welfare (DPW) affirming a hearing officer's denial of medical assistance (MA) benefits to Margaret Bird. We affirm.

The essential facts are undisputed. Margaret Bird entered Brandywine Hall Care Center, a nursing home in Chester County, on January 29, 1996. At that time, Mrs. Bird and her husband, H. Paul Bird, possessed $213,459.41 in assets available for Mrs. Bird's care. On June 28, 1996, the Birds' two daughters, Jean McBride, who is also Mrs. Bird's attorney-in-fact, and Barbara Ristine, created an irrevocable trust, naming themselves as grantors. The trustee of the trust was Linda Foy, described as the banker and friend of Mr. Bird. On that same date, Mrs. Bird assigned her right, title, and interest in seven certificates of deposit to Mr. Bird, who then purchased an annuity

from the irrevocable trust. The amount used to purchase the annuity was $143,400. Pursuant to the terms of an annuity agreement entered into between Linda Foy and Mr. Bird, Mr. Bird was to receive monthly payments in the amount of $1000 beginning August 1, 1996 for a period of thirty-six months and, thereafter, monthly payments in the amount of $3000 for the remainder of Mr. Bird's life. Upon the death of Mr. Bird, the annuity agreement expired and no further payments would be made to Mr. Bird's estate. The annuity agreement specifically provided:

> The intent of this irrevocable annuity is to return to Annuitant [Mr. Bird] an amount, the present value of which is equal to or greater than the Investment, taking into consideration Annuitant's actuarial life expectancy as defined by *State Medicaid Manual*, Health Care Financing Administration Transmittal 61, November 1994, Section 3258.9(B), while also preserving the Investment for use by annuitant if medical assistance or other public benefits covering long-term nursing care are reduced or eliminated.

Exhibit C–7, p. 1.

The trust agreement provides, among other things, that upon the death of Mr. and Mrs. Bird, the principal and undistributed income of the trust estate shall be distributed equally between the Grantors (the Birds' children), per stirpes. The trust agreement also permits the trustee, in her sole discretion, to make loans from the trust estate to the estate of any Grantor or the estate of any Grantor's spouse. The trustee's discretion may not be challenged, and the terms for any loan may be made in the trustee's sole discretion. The trustee is also authorized to purchase assets from the Grantors' estates and assets from the estate of any deceased member of the Grantors' immediate family. The trustee, in her sole and absolute discretion, may also make gifts from the trust estate. *See,* generally, Exhibit C–6.

Also, on June 28, 1996, Jean McBride, as Mrs. Bird's attorney-in-fact, completed an application for MA for Mrs. Bird. By notification dated October 28, 1996, the County Assistance Office (CAO) advised the Birds that Mrs. Bird was ineligible for MA for twenty-six months from June 28, 1996, the date that the CAO determined that a transfer of assets for less than fair consideration had occurred. The CAO arrived at its determination by noting that at the time Mrs. Bird entered the nursing home, she and her husband had $213,459.41 in available assets. As will be more fully explained later in this opinion, DPW regulations provide that the MA applicant is eligible for MA when her assets are reduced to $2400, while the spouse remaining in the community (community spouse) is permitted to retain a share of the assets (Community Spouse Resource Allowance), which DPW calculated for Mr. Bird to be, as adjusted, $83,172. Subtracting $2400 and $83,172, together with $17,619 already spent on nursing home charges, there remained $110,268.41 from the original $213,-459.41. The CAO determined that this remaining amount had been transferred for less than fair consideration and in violation of DPW regulations when it was used to purchase the annuity. This money was thus considered available for paying Mrs. Bird's nursing home costs. According to the regulatory scheme, the CAO then divided $110,268.41 by the then-average monthly nursing home charge in Pennsylvania to arrive at a twenty-six month period of ineligibility for MA, commencing on the date the funds were transferred.

The Birds appealed and a hearing was held before a hearing officer. Testifying for DPW were an income maintenance caseworker, an income maintenance caseworker supervisor, and the counsel for the southeastern region of DPW, all of whom reviewed Mrs. Bird's application. Jean McBride testified for Mrs. Bird only to identify Linda Foy as Mrs. Bird's banker and friend. The hearing officer denied the appeal, concluding that the Birds had not rebutted the CAO's determination that the transfer of assets was for less than fair

consideration and was made with the intent to qualify for MA. Specifically, the hearing officer opined as follows:

In the absence of arguments or testimony to establish why, with [Mrs. Bird] being in the nursing home since January, 1996, and with appreciable assets currently available to her, on June 28, 1996, her power of attorney applied for [nursing home care] benefits and [Mrs. Bird] assigned her interest to her community spouse, this Hearing Officer concludes that the presumption has not been rebutted that [Mrs. Bird's] power of attorney and [Mrs. Bird] acted in the ultimate best interest of the community spouse, rather than that of [Mrs. Bird] and did so to qualify [Mrs. Bird] for MA benefits.

As regards the issue of the transfer of assets by the institutionalized spouse to her community spouse and the subsection of same to fair consideration, while regulations 55 Pa.Code § 178.104(e)(2) and (3) detail that an individual will not be ineligible for payment for [nursing home care] if assets were transferred to the community spouse or to another for the sole benefit of the community spouse, nevertheless it must be shown that either the individual intended to dispose of the assets for fair consideration or for other valuable consideration, or the assets were transferred exclusively for a purpose other than to qualify for MA, or the assets transferred for less than fair market value were returned to the individual. Arguments by [Mrs. Bird's] legal representative have not shown that any of these conditions was met.

*Appeal of: Margaret Bird,* Case No. 150210741–001, *slip. op.* at 3–4 (January 23, 1998). The Director of the Bureau of Hearings and Appeals affirmed the hearing officer's decision, and this appeal followed.

This Court's scope of review is limited to a determination of whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, and whether constitutional rights were violated. *Oriolo v. Department of Public Welfare,* 705 A.2d 519 (Pa.Cmwlth.1998). The Birds argue that DPW's final administrative order affirming the denial of MA benefits is in error because: (1) DPW ignored its own regulations pertaining to MA eligibility and spousal protection; (2) DPW ignored its regulations permitting permissible transfers between spouses and transfers for fair market value; (3) the hearing officer's opinion omits supporting facts and evidence and, (4) DPW's decision is arbitrary and inconsistent with the law. The crux of the Birds' argument is that DPW's regulations permit unrestricted transfers between spouses and transfers for fair market value to others. The Birds argue that all that occurred here was a permitted transfer from one spouse to another who then purchased an annuity at fair market value, thereby reducing the Birds' assets to a point rendering Mrs. Bird eligible for MA. We disagree with the Birds' reading of the law on several levels.

"The Medicaid program was established in 1965 in Title XIX of the Social Security Act [42 U.S.C. §§ 1396–1396r] to provide federal financial assistance to states that choose to reimburse certain costs of medical treatment for needy persons." *Oriolo,* 705 A.2d at 520. Coverage may be provided for those described as the "medically needy," whose income and resources are insufficient to meet necessary medical costs. 42 U.S.C. § 1396A(a)(10)(c). States providing such coverage must establish eligibility standards for the medically needy. 42 U.S.C. § 1396A(a)(17). In Pennsylvania, Section 442.1 of the Public Welfare Code [1] authorizes DPW to establish such standards. DPW's duly promul-

---

1. Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. § 442.1. Section 442.1 was added by

Section 5 of the Act of July 31, 1968, P.L. 904.

gated regulations provide that an applicant is eligible for medically needy MA benefits if the applicant has available resources of $2400 or less. 55 PA Code § 178 (App.A).

Prior to 1988, the eligibility rules under the Medicaid program often forced married couples to spend virtually all of their joint resources to allow one to qualify for MA nursing home benefits, thus often leaving the community spouse impoverished. *See Cleary v. Waldman,* 959 F.Supp. 222 (D.N.J.1997). In response to this circumstance, Congress passed the Medicare Catastrophic Coverage Act of 1988 (MCCA), 42 U.S.C. § 1396r–s, *as amended.* The primary intent of the MCCA was "to end the pauperization [of the community spouse] by assuring that [he or she] has a sufficient but not excessive amount of income and resources available" when the other spouse is institutionalized in a nursing home. H.R.Rep. No. 105(II), pt. 2 at 67, 1988 U.S.C.G.A.N. at 888. *See also Cleary.* Also, the MCCA was designed to eliminate loopholes which previously allowed couples, or one of them, to qualify for MA even though they had substantial assets. *Cleary.* As the Massachusetts Supreme Court stated:

> Under the prior eligibility rules ... a couple could shelter a majority of the resources in the community spouse's name, while the institutionalized spouse received Medicaid. The MCCA closed this loophole by attributing certain amounts of the couple's combined resources to each spouse for eligibility purposes. Thus, the MCCA struck a balance between preventing impoverishment of the community spouse and ensuring that no one avoided contributing his or her fair amount to medical care.

*Thomas v. Commissioner of the Division of Medical Assistance,* 425 Mass. 738, 682 N.E.2d 874, 876 (1997).

■ DPW's regulations under the MCCA mirror the federal requirements set forth in 42 U.S.C. § 1396r. Under these regulations, DPW is required to calculate the total amount of the couple's resources at the time one spouse is admitted into a nursing facility. 55 Pa.Code § 178.121(g). The spouse remaining in the community is permitted to keep one-half of the total resources owned by the couple without rendering the institutionalized spouse ineligible for MA. There is, however, a minimum community spouse requirement and a maximum cap regardless of the amount constituting one-half of the couples' resources. 42 U.S.C. § 1396r–5(c), (f). At the time Mrs. Bird applied for MA, the maximum community spouse resource allocation (CSRA) was $76,740, and the minimum CSRA was $15,348. 42 U.S.C § 1396r–5(f)(2). The amounts are adjusted annually. The CSRA is considered a "protected resource" that does not affect the eligibility of the institutionalized spouse to receive MA. 42 U.S.C. § 1396r–5(c), (f).[2]

■ Additionally, a community spouse is able to receive a certain monthly income without rendering the institutionalized spouse ineligible for MA. 42 U.S.C. § 1396r–5(d). Should this income be insufficient to maintain the community spouse above the federal impoverishment limits, either the income may be augmented by a sufficient portion of the institutionalized spouse's income, or the CSRA may be adjusted upward to the extent that sufficiently extra interest income is generated. *See* 55 Pa.Code § 178.124(b). This computation of protected resources controls how much of the couple's total resources that the spouse may retain. *Cleary.* Any non-protected resources are considered available to the institutionalized spouse and must be spent down to $2400 before the institutionalized spouse may be-

---

**2.** Other protected resources, or those excluded for determining a couple's available resources, are the marital home, household goods, personal belongings, the value of buri- al space, and a limited amount of the value of an automobile and funds for burial expenses. *Thomas.*

come eligible for MA. 55 Pa.Code § 178.1 (Append.A).

In the instant case, there is no dispute over the amounts involved. The Birds had $213,459.41 in available resources at the time Mrs. Bird entered the nursing home. The Birds spent $17,619 on nursing home costs prior to applying for MA. The couple presented no evidence that other amounts were spent for their benefit (aside from the annuity that is in dispute herein); thus, the available resources totaled $195,840.41 at the time of MA application. DPW determined that Mr. Bird was eligible for a CSRA of $76,740, plus an upward adjustment of $6,432 more. Mrs. Bird was entitled to retain $2400. Thus, DPW determined under the regulations that the Birds must spend down the remainder, $110,268.41, prior to Mrs. Bird being eligible for MA.

■ The Birds do not challenge the regulatory scheme setting forth a CSRA cap for the community spouse or the $2400 cap for the institutionalized spouse. Rather, they argue that other regulations permit the spending down of the Birds' money on the annuity sold by the trust created by their adult children. These regulations are contained in 55 Pa.Code § 178.104, which governs transfers made by MA applicants and their spouses made on or after July 30, 1994. This section provides in pertinent part:

(a) If assets are disposed of on or after July 30, 1994, §§ 178.105 and 178.106 (relating to presumption of disposition of assets to qualify for MA for transfers on or after July 30, 1994; and reestablishment of MA eligibility after transfers made on or after July 30, 1994) and this section apply to an institutionalized individual who is applying for or receiving MA for NFC [Nursing Facility Care] ... and the individual or the individual's spouse transfers assets for less than FMV [Fair Market Value].

(b) An institutionalized individual who disposes of assets for less than FMV on or after the look back date in subsection

(c) is ineligible for MA for NFC.... The transfer of assets by the community spouse to a person other than the institutionalized spouse is treated and affects the eligibility of the institutionalized spouse the same as a transfer by the institutionalized spouse.

(c) The look-back date shall be 36 months from the date on which the individual is both institutionalized and has applied for MA....

(d) The number of months of ineligibility for the institutionalized individual who disposes of assets for less than FMV shall be equal to the total cumulative UV [Uncompensated Value, as defined by 55 Pa.Code. § 178.2] of all assets transferred by the individual or the individual's spouse on or after the lookback date divided by the average monthly cost to a private patient of NFC in effect in the Commonwealth at the time of application.

(e) An individual will not be ineligible for payment for NFC if:

(1) The assets were the resident property and title to the home was transferred to:

(i) The spouse of the individual.

(ii) The individual's child who is under 21 years of age, or blind or permanently and totally disabled....

(2) The assets were transferred to one of the following:

(i) The individual's spouse or to another for the sole benefits of the individual's spouse.

(ii) To another for the sole benefit of the individual spouse, from the individual spouse....

(3) The individual, the individual's spouse or someone else acting on behalf of the individual can show that one of the following applies:

(i) The individual intended to dispose of the assets either at FMV or for other valuable consideration.

(ii) The assets were transferred exclusively for a purpose other than to qualify for MA.

(iii) The assets transferred for less than FMV were returned to the individual.

(4) The Commonwealth determines that denial of eligibility would cause undue hardship as defined in § 178.2....

The Birds focus upon Section 178.104(e)(2)(i) and (e)(3)(i) in support of their argument that Mr. Bird's purchase of the annuity did not render Mrs. Bird ineligible for MA for the stated period of time. The Birds note that Section 178.104(e)(2)(i) provides that an individual will not be ineligible for nursing home MA because he or she transferred or caused to be transferred assets to the individual's spouse. On June 28, 1996, Mrs. Bird, through her power of attorney, transferred virtually all of her assets to Mr. Bird. The Birds further note that Section 178.104(e) establishes that transfers for fair market value [3] by an applicant or his or her spouse will not render the applicant ineligible for MA. The Birds then proceed to argue that the purchase of the annuity by Mr. Bird was a transaction for fair market value. The Birds explain that the annuity was designed to be paid over at least the life expectancy of Mr. Bird (4.89 years plus 1.11 years to take into account the possibility that Mr. Bird may outlive his life expectancy, purportedly in accordance with DPW's Nursing Care Handbook) and that should Mr. Bird live to his life expectancy, he would receive $144,000 for his $143,400 investment. The Birds argue that the annuity is therefore "actuarially sound" and a fair market purchase "according to DPW's own regulations." Birds' brief, p. 17.

There are several problems with the Birds' argument, however. The Birds have failed to construe the law and regulations in their entirety and they have failed to recognize that they are the parties sustaining the burden of proof with respect to their transactions, not DPW. *Stanley v. Department of Public Welfare,* 112 Pa. Cmwlth. 157, 535 A.2d 674 (1987). As the *Cleary* Court stated:

The Medicaid Act contains complex, interrelated provisions, and it would be foolhardy to impute a plain meaning to any of its provisions in isolation. A statute must be read as a whole; words depend upon context; 'they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.' ... Thus it is necessary to examine the origins and purposes of the MCCA as well as the structure and language of all of its provisions.

*Cleary,* 959 F.Supp. at 228–29 (citation omitted).

We have already observed that the purpose of the MCCA is to prevent the impoverishment of the community spouse by assuring sufficient but not excessive resources and income. To that end, the law provides for a CSRA that caps the amount of available resources jointly owned by the couple that the community spouse may retain. DPW will calculate an upward adjustment should the income of the community spouse be insufficient; the extra resources would then be in an amount sufficient to generate the additional income required. The transactions made on June 28, 1996 by the Birds had the effect of sheltering money that would have been available for the care of Mrs. Bird and which would effectively provide Mr. Bird with the benefit of resources in excess of the CSRA should he live [4] (es-

---

**3.** Fair Market Value is defined as "[t]he price which property can be expected to sell for on the open market or would have been expected to sell for on the open market in the geographic area in which the property is located." 55 Pa.Code § 178.2.

**4.** The Birds assert that after the purchase of the annuity, they were left with combined assets totaling $52,440.41. Adding this amount to the purchase price of the annuity, $143,400, provides the Birds with assets well

sentially all of the Birds' joint resources not already spent on nursing home costs), or provide the Birds' adult children or their families with substantial funds should he not live.[5]

The Birds argue that the regulations do not restrict how an applicant and spouse may "spend down" the excess resources in order to qualify for MA, so long as the transactions, made during the look-back period, were for fair consideration. Such transactions, however, may not contravene other regulations that clearly articulate the intent of the MCCA. The MCCA and DPW's regulations very plainly place a cap on the protected resources that the community and institutionalized spouses may keep for the institutionalized spouse to be eligible for MA. "The amount [of resources transferred from the institutionalized spouse to the community spouse] that may be protected may not exceed the spousal share subject to the maximum [CSRA]...." 55 Pa.Code § 178.125(a). The MCCA, setting forth provisions establishing the CSRA with its maximum cap, provide that its provisions *supersede* those of any other provision of the Medicaid law, including those provisions relied upon by the Birds.[6] 42 U.S.C. 1396r–5(a)(1).

█ This is not to say that a purchase of a bona fide annuity for the benefit of the community spouse is always proscribed by the MCCA. It remains, however, the applicant's burden to show that transfers of unprotected funds, that would have been otherwise available for the costs of medical care, have been made in full accordance with the MCCA and DPW regulations. This Court previously stated:

> Although there is no constitutional right to receive public assistance ... a person who is medically needy is statutorily eligible for MA. This Court has

recognized our legislature's legitimate interest in allocating undeniably scarce social welfare resources to those considered most needy.... The burden of proving eligibility for assistance rests with the applicant....

*Stanley* at 677 (citations and footnote omitted). "[I]t is the applicant's responsibility to establish eligibility, not" DPW's. *Swartz v. Department of Public Welfare,* 697 A.2d 588, 592 (Pa.Cmwlth.1997).

The Public Welfare Code specifically places the burden upon the applicant to demonstrate that transactions made prior to application for MA were bona fide and for fair market value:

> Any person applying for medical assistance benefits shall certify to the department that he or she has not transferred title to or ownership interests in any real or personal property to any third party within the two years immediately preceding such application; if such a transfer has occurred, the recipient must disclose the nature of the transfer and must demonstrate that it involves, a bona fide arm's length transaction resulting in compensation paid to the transferor in an amount equal to or greater than the fair market value of the property as determined by the department.

62 P.S. § 1404(a).

DPW is the payer of last resort. 55 Pa.Code § 178.6(a). DPW regulations provide that the applicant shall identify third party sources that are available to pay for medical services, including the spouse, and "that these shall be used to the fullest extent possible before payment is made by MA." *Id.* The regulations further create a presumption that property owned solely or jointly by the applicant is

---

over the CSRA of $83,172 plus Mrs. Bird's $2400.

**5.** The MCCA and DPW regulations do not provide that transfers to children (except in certain circumstances not here alleged) render those assets unavailable for purposes of

determining MA eligibility. *See* 55 Pa.Code § 178.104(e)(1) and (2).

**6.** The regulations set forth at 55 Pa.Code § 178.104(e) are adopted from the nearly identical provisions of the Medicaid law set forth at 42 U.S.C. § 1396p(c)(2).

available for payment of medical services. 55 Pa.Code § 178.4. Moreover, DPW, when reviewing an application for MA, may apply these presumptions and may also presume that disposed-of assets (made during the look-back period) were transferred with the improper intent to qualify for MA. 55 Pa.Code § 178.105.[7] DPW regulations set forth a procedure for the applicant to rebut this presumption before the CAO, prior to a hearing. *Id.* Section 178.104, which is at the heart of the Birds' argument, specifically provides that the presumption concerning disposition of assets set forth at Section 178.105 applies to the transfers made by an applicant or spouse for less than fair market value. 55 Pa.Code § 178.104(a). A rebuttable presumption is defined as follows:

> A rule of evidence which permits the Department to assume that when certain facts are true, other facts are true, without having proof of those other facts. The presumption is automatic, and can be disproved or rebutted only by the applicant/recipient presenting evidence at a prehearing conference or a Departmental fair hearing. If the applicant/recipient presents no evidence at the prehearing conference or at the fair hearing to disprove the presumption, the presumption remains unrebutted and stands.

55 Pa.Code § 178.2.

■ Here, there is nothing in the record that indicates that a prehearing conference took place.[8] At the fair hearing, however,

it was clearly incumbent upon the Birds to prove Mrs. Bird eligible for MA. *Swartz; Stanley.* Prior to the hearing, and in accordance with the regulatory scheme, DPW had made the presumption that the transfers were for less than fair consideration and for the purpose of rendering Mrs. Bird eligible for MA while sheltering available assets.[9] It was therefore the Birds' burden at the fair hearing to rebut this presumption. 55 Pa.Code § 178.2. Further—and perhaps more importantly— Section 178.104(e)(3), regarding transfers of assets to non-spouses or children under certain conditions, expressly states that the applicant or his or her spouse is required to "show" that either (1) the *intent* behind the transfer was to dispose of the assets for fair market value or other valuable consideration or (2) the assets were transferred for a purpose other than to qualify for MA.

At the hearing, however, the Birds presented virtually no evidence.[10] No evidence was set forth to establish that the purchase of the annuity was a bona fide arm's length transaction made for fair market value or to meet the requirements of Section 178.104(e)(3). Instead, the Birds incorrectly argue in their brief that DPW had the burden at the hearing to show that the purchase of the annuity was for less than fair market value. This is contrary, however, to statute, regulation, and case law.[11] 62 P.S. § 1404(a); 55 Pa. Code §§ 178.2, 178.104(e)(3); *Stanley.*

---

7. DPW may determine whether assets transferred to an annuity were pursuant to a valid retirement plan or were transferred with the intent to "abusively shelter" such assets. State Medicaid Manual, Health Care Financing Administration, Pub. 45–3, Transmittal No. 64 (Nov.1994), Section 3258.9(B).

8. In fact, evidence at the hearing indicated that the Birds requested an immediate hearing in lieu of a pre-hearing conference upon receipt of DPW's rejection of Mrs. Bird's application for MA. Notes of Testimony (N.T.) at 27–28.

9. The Birds are correct in arguing that transfers from one spouse to another need not be

for fair market value pursuant to 55 Pa.Code § 178.104(e)(2). This is of no moment, however, because it is well established that a transfer of assets from one spouse to another does not render those assets unavailable for the applicant's medical needs. *Oriolo.*

10. The Birds called one witness, only to identify the trustee, Linda Foy, as Mr. Bird's friend and banker.

11. The Birds' position, if adopted, would place the burden of proving ineligibility upon DPW. Proof that a transaction was for less than fair market value creates more than a presumption—it is the very case itself. The

At the hearing, witnesses for DPW testified as to why the presumption of improper motive and transfer for less than fair market value had been made with regard to the purchase of the annuity. DPW noted that Mrs. Bird possessed a large amount of available resources for her care when she went into the nursing home, she transferred this money without receiving any value in return (N.T. at 26–27), and the money was then transferred to a trust created by the Birds' children, strongly suggesting that what had occurred was a "mechanism ... used to transfer money to the [adult] children" and to improperly qualify Mrs. Bird for MA. N.T. at 36–37. DPW further provided testimony that it viewed the transaction as a mechanism to defeat the spousal impoverishment provisions of the MCCA that place a cap on protected resources for the community spouse. N.T. at 57–61. Instead of presenting evidence to rebut DPW's presumption and to show that they made a transaction for fair consideration in the purchase of the annuity, which transaction did not violate the MCCA, the Birds impermissibly attempted to shift the entire burden upon DPW to prove that the purchase of the annuity was not for fair market value.

■ The Birds now argue before us that the terms of the annuity, on its face, demonstrate that the purchase was a transaction for fair market value. This argument is wholly unconvincing. Mr. Bird purchased an annuity for $143,400 that would, over a period of six years, should he live that long, reap a return of $144,000, or

$600 in interest.[12] Moreover, should Mr. Bird die before reaching the end of his purported life expectancy, his estate forfeits any further return on his investment. In this regard, we note that although the Birds allege that the annuity return was geared towards Mr. Bird's alleged life expectancy in accordance with DPW guidelines, there was absolutely no evidence set forth regarding what Mr. Bird's actual state of health was at the time he purchased the annuity. In sum, the annuity does not demonstrate on its face that it is an instrument that "would be expected to sell ... on the open market...." 55 Pa. Code § 178.2. Further, the fact that the Birds' children stand to benefit from this transaction[13] indicates that the purchase of the annuity was not a "bona fide arm's length transaction." 62 P.S. § 1404(a). DPW was quite correct in making the presumption that the purchase of the annuity was for less than fair consideration, was made with the intent to qualify Mrs. Bird for MA, and is contrary to the provisions and intent of the MCCA.

■ Therefore, the Birds have manifestly failed to establish Mrs. Bird's eligibility for MA in lieu of the presence of excess unprotected resources. The Birds have failed to establish that the disputed resources have been rendered protected under the MCCA by their transfers or that the ultimate transfer to the trust established by their children was accomplished by a bona fide arm's length transaction for

Birds' interpretation of Section 178.104(a) as requiring DPW to assume the burden of proving that a transaction was made for less than fair market value makes absolutely no sense when read in the context of both federal Medicaid law and DPW's regulations as a whole. In fact, the Birds' interpretation ignores all the other regulations and attempts a construction made in isolation. In this regard, we note again that even without DPW's ability to make presumptions regarding the character of transfers by an applicant or the spouse, Section 178.104(e)(3) clearly places the burden on the applicant or spouse to show that the intent was to make a fair market value

transfer or to transfer the assets exclusively for a purpose other than to qualify for MA.

12. Birds' Brief, pp. 16–17.

13. Any proceeds from the trust will go to them following the death of their parents. Further, the trust places virtually no limits on the trustee's discretion to provide gifts or loans from the trust estate, and the trust estate is authorized to purchase assets from the estates of the children or their immediate family members.

fair market value. The final administrative order of DPW is therefore affirmed.[14]

## ORDER

AND NOW, this 3rd day of June, 1999, the order of the Pennsylvania Department of Public Welfare in the above-captioned matter is hereby affirmed.

---

14. Although our reasoning differs somewhat from that articulated by the hearing officer, we may affirm on other appropriate grounds. *Karl Smith Development Co. v. Borough of Aspinwall*, 125 Pa.Cmwlth. 687, 558 A.2d 181 (1989). We note further that the hearing officer did state the reasons for her decision based upon the facts submitted into evidence, contrary to the Birds' argument. Any dearth of additional factual findings must be attributed to the Birds' failure to submit evidence in support of their appeal.