Eileen DEMPSEY, By Her Husband and Guardian Ad Litem, Edward DEMPSEY, Petitioner,

v.

DEPARTMENT OF PUBLIC WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 13, 2000.

Decided May 15, 2000.

Publication Ordered July 18, 2000.

Kenneth A. Wise, Harrisburg, for petitioner.

Diana C. Clark, Harrisburg, for respondent.

Before DOYLE, President Judge, and McGINLEY, J. and MIRARCHI, Jr., Senior Judge.

MIRARCHI, Jr., Senior Judge.

Eileen Dempsey, by her husband and guardian ad litem, Edward Dempsey, petitions this Court to review a final administrative order of the Pennsylvania Department of Public Welfare (DPW) affirming a hearing officer's denial of her appeal from a decision of the County Assistance Office

(CAO). The CAO denied Mrs. Dempsey's application of medical assistance (MA) benefits for nursing home care. We affirm.

Mrs. Dempsey, who apparently suffers from symptoms of Alzheimer's Disease, was admitted to the Middleton Nursing Home in December 1996. In January 1997, the CAO completed a resource assessment for the Dempseys. This assessment placed the Dempseys' countable and verifiable resources at $404,630 at the time of Mrs. Dempsey's admission to the nursing home. In January 1998, Mr. Dempsey transferred $340,000 of these assets to purchase a single premium, irrevocable annuity that would pay him (as sole payee) income of $6,300 per month for five years. Two months later, Mr. Dempsey bought a similar annuity for $25,000 that would pay him (as sole payee) income of $730 per month for five years. Three months later, Mrs. Dempsey, through her husband as guardian ad litem, applied for MA to pay for her nursing home costs.

The CAO responded with a letter asking Mr. Dempsey why he had transferred $365,000 of their joint assets immediately before applying for MA, for what the CAO considered less than fair market value. Mr. Dempsey responded by letter stating that he transferred the funds as an investment strategy. In particular, he stated that he was professionally advised that for a person of his age (seventy years), it was more prudent to place the assets where he could obtain a fixed income rather than expose them to the volatility of the stock market (where the Dempseys' assets had apparently been invested). Further, he stated that the transfer would also reduce the Dempseys' taxes. The CAO requested proof of these assertions, and Mr. Dempsey provided certain documentation.

After receipt of this documentation, the CAO denied Mrs. Dempsey's application for MA and further determined that she would be ineligible for MA until August 2004 as a result of what the CAO presumed was a transfer of $365,000 of countable assets for less than fair market consideration and for the impermissible purpose of qualifying for MA. The Dempseys appealed, and a hearing officer held a hearing, at which Mr. Dempsey and an income maintenance casework supervisor for DPW testified.

The hearing officer concluded that the Dempseys failed to rebut DPW's presumption that they had transferred assets for less than fair market value and for the purpose of qualifying Mrs. Dempsey for MA. Accordingly, the hearing officer determined that Mrs. Dempsey was ineligible to receive MA for a period commensurate with the number of months of nursing home care that could be purchased by $365,000. The Secretary of DPW affirmed, and this petition for review followed.

■ This Court's scope of review is limited to a determination of whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, and whether constitutional rights were violated. *Oriolo v. Department of Public Welfare*, 705 A.2d 519 (Pa.Cmwlth.1998). The Dempseys argue that DPW erred by presuming that the transfer of their assets to the annuities was a disqualifying event when the annuities were actuarially sound in accordance with relevant federal guidelines. The Dempseys also argue that DPW erred by failing to make a finding regarding the actuarial soundness of the annuities. Finally, the Dempseys argue that the case law relied upon by DPW is inapplicable to the factual situation present in this case.

In support of their argument, the Dempseys rely upon a single guideline of the Health Care Financing Administration (HCFA) of the United States Department of Health and Human Services set forth in the State Medicaid Manual. Section 3258.9(B) of the State Medicaid Manual, HCFA, No. 45–3, Transmittal No. 64 (Nov. 1994), provides in relevant part:

Annuities, although usually purchased in order to provide a source of income for retirement, are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid. In order to avoid penalizing annuities validly purchased as part of a retirement plan but to capture those annuities which abusively shelter assets, a determination must be made with regard to the ultimate purpose of the annuity (i.e., whether the purchase of the annuity constitutes a transfer of assets for less than fair market value). If the expected return on the annuity is commensurate with a reasonable estimate of the life expectancy of the beneficiary, the annuity can be deemed actuarially sound.

To make this determination, use the following life expectancy tables, compiled from information published by the Office of the Actuary of the Social Security Administration. The average number of years of expected life remaining for the individual must coincide with the life of the annuity. If the individual is not reasonably expected to live longer than the guarantee period of the annuity, the individual will not receive fair market value for the annuity based on the projected return. In this case, the annuity is not actuarially sound and a transfer of assets for less than fair market value has taken place, subjecting the individual to a penalty. The penalty is assessed based on a transfer of assets for less than fair market value that is considered to have occurred at the time the annuity was purchased.

For example, if a male at age 65 purchases a $10,000 annuity to be paid over the course of 10 years, his life expectancy according to the table is 14.96 years. Thus, the annuity is actuarially sound. However, if a male at age 80 purchases the same annuity for $10,000 to be paid over the course of 10 years, his life expectancy is only 6.98 years. Thus, a pay out of the annuity for approximately 3 years is considered a transfer of assets

for less than fair market value and that amount is subject to penalty.

The Dempseys argue that because Mr. Dempsey had a life expectancy of 11.35 years at the time of purchase, according to the applicable tables, the two five-year annuities at issue must be considered actuarially sound and not subject to penalty. The Dempseys thus argue that Section 3258.9(B) of the State Medicaid Manual is conclusive, that it prohibits DPW from making a presumption that their assets were transferred for less than fair market value, and that all other considerations surrounding the transfer of assets are subordinate to the fact that the annuities appear to be actuarially sound under these provisions.

In the recent decisions of *Bird v. Department of Public Welfare*, 731 A.2d 660 (Pa.Cmwlth.1999); *Ptashkin v. Department of Public Welfare*, 731 A.2d 238 (Pa. Cmwlth.1999); and *Pyle v. Department of Public Welfare*, 730 A.2d 1046 (Pa.Cmwlth. 1999), however, we emphasized several matters regarding the construction of Medicaid law overlooked by the Dempseys in their argument. Moreover, we determined in those cases, contrary to the Dempseys' argument, that the "actuarial soundness" of an annuity in accordance with life expectancy tables as described in the State Medicaid Manual does not render a transfer of assets to such an annuity a matter beyond the review of DPW in its determination of whether a MA application for nursing home care should be granted or denied.

■ First, we again emphasize the obvious:

The Medicaid Act contains complex, interrelated provisions, and it would be foolhardy to impute a plain meaning to any of its provisions in isolation. A statute must be read as a whole; words depend upon context; 'they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take

their purport from the setting in which they are used....'

*Bird,* 731 A.2d at 666 (quoting *Cleary v. Waldman,* 959 F.Supp. 222, 228–29 (D.N.J. 1997)) (citation omitted). As pertaining to the eligibility requirements of an institutionalized applicant for MA who has a spouse remaining in the community, as is the present case, the provisions of the Medicare Catastrophic Coverage Act of 1988 (MCCA), *as amended,* 42 U.S.C. § 1396r–s, must be particularly examined. We refer to *Bird, Ptashkin,* and *Pyle* for a more thorough explanation of the MCCA, ꞓ ꞓe history behind this legislation and the Medicaid program generally, and the regulatory scheme promulgated by DPW to implement the provisions and mandates of this federally financed state assistance program. For purposes of our review, a summary shall be sufficient.

DPW's duly promulgated regulations provide that an applicant is eligible for medically needy MA benefits if the applicant has available resources of $2400 or less. 55 Pa Code § 178 (App.A). Where the applicant is institutionalized and leaves a spouse remaining in the general community, DPW is required to calculate the total amount of the couple's resources at the time one spouse is admitted into a nursing facility. 55 Pa.Code § 178.121(g). The spouse remaining in the community is permitted to keep one-half of the total resources owned by the couple without rendering the institutionalized spouse ineligible for MA. There is, however, a minimum community spouse requirement and a maximum cap regardless of the amount constituting one-half of the couples' resources. 42 U.S.C. § 1396r–5(c), (f). At the time Mrs. Dempsey applied for MA, the maximum community spouse resource allocation (CSRA) was $76,740. 42 U.S.C § 1396r–5(f)(2). The amounts are adjusted annually. The CSRA is considered a "protected resource" that does not affect the eligibility of the institutionalized

spouse to receive MA. 42 U.S.C. § 1396r–5(c), (f).

Additionally, a community spouse is able to receive a certain monthly income without rendering the institutionalized spouse ineligible for MA. 42 U.S.C. § 1396r–5(d). Should this income be insufficient to maintain the community spouse above the federal impoverishment limits, either the income may be augmented by a sufficient portion of the institutionalized spouse's income, or the CSRA may be adjusted upward to the extent that sufficiently extra interest income is generated. *See* 55 Pa. Code § 178.124(b). This computation of protected resources controls how much of the couple's total resources that the spouse may retain. *Bird.* Any non-protected resources are considered available to the institutionalized spouse and must be spent down to $2400 before the institutionalized spouse may become eligible for MA. 55 Pa.Code § 178.1 (Append.A).

Other regulations provide that transfers of assets by the applicant or his or her spouse made within the prescribed look-back period (generally thirty-six months from the date the applicant is both institutionalized and has applied for MA) will render the applicant temporarily ineligible for MA if the assets were transferred for less than fair market value. 55 Pa.Code § 178.104. The length of the ineligibility shall be the equivalent of the number of months that the transferred assets could purchase the average nursing home care in the Commonwealth. *Bird.* Implicit in the regulations set forth at Section 178.104, however, is that a transfer of assets made by the applicant or spouse for fair market value within the look-back period will *not* result in ineligibility. As we discussed in *Bird,* however, the MCCA provides that its provisions establishing the CSRA with its maximum cap, as well as the prescribed monthly allowances for the community spouse, *supersede* any other provision of Medicaid law, including those provisions set forth at 55 Pa.Code § 178.104.[1] 42 U.S.C. § 1396r–5(a)(1).

---

1. The regulations set forth at 55 Pa.Code

§ 178.104 mirror federal provisions of the

■ Moreover, DPW is the payer of last resort. 55 Pa.Code § 178.6(a). DPW regulations provide that the applicant shall identify third party sources that are available to pay for medical services, including the spouse, and "that these shall be used to the fullest extent possible before payment is made by MA." *Id.* The regulations further create a presumption that property owned solely or jointly by the applicant is available for payment of medical services. 55 Pa.Code § 178.4. DPW, when reviewing an application for MA, may apply these presumptions and may also presume that disposed-of assets (made during the look-back period) were transferred with the improper intent to qualify for MA. 55 Pa.Code § 178.105. As always, the burden of proving eligibility for MA is on the applicant. *Bird; Ptashkin; Pyle.* DPW is empowered to presume that a transfer of assets within the applicable period has been made in contravention of the Medicaid laws, and it is then the burden of the applicant to rebut this presumption at a hearing if not before. *Ptashkin.*

■ Here, Mr. Dempsey transferred $365,000 of joint assets into irrevocable annuities immediately before he applied for MA on behalf of his wife. These annuities would bring Mr. Dempsey far in excess of the maximum monthly income allowance for a community spouse under the MCCA and would further serve to effectively shelter assets far in excess of the CSRA and the $2400 allowable to Mrs. Dempsey. Therefore, granting Mrs. Dempsey MA from scarce resources would appear to be a gross violation of the MCCA in light of Mr. Dempsey's transfers. Moreover, the transactions do not appear to have conferred any tangible benefit upon Mrs. Dempsey at all. DPW accordingly correctly presumed that the transactions were made for less than fair market value and for the impermissible purpose of qualifying for MA.

■ It was the Dempseys' obligation to rebut this presumption at the hearing. Mr. Dempsey testified that he made the transactions as an investment strategy to avoid the volatility of the market, to insure a fixed income for himself, and to take advantage of certain tax benefits. Mr. Dempsey did not, however, testify that he could only achieve these goals by rendering the assets unavailable for use towards his wife's nursing home care. That is, Mr. Dempsey did not set forth evidence that circumstances *required* the placement of substantial assets in irrevocable instruments. Suffice it to say, the Medicaid laws and the MCCA in particular do not provide that otherwise available assets may be rendered unavailable by placing them in the service of investment strategies and tax benefits.[2] Further, Mr. Dempsey failed to even provide evidence regarding the transactions themselves. No agreement or instrument detailing the full terms of the annuities was introduced into evidence. Therefore, on the most fundamental level, Mr. Dempsey failed to establish that the assets were exchanged for fair market value after an arms-length transaction.

■ The Dempseys simply rely on the fact that the annuities appear to be actuarially sound in accordance with Section 3258.9(B) of the State Medicaid Manual, a federal guideline. A federal guideline, however, cannot overturn the provisions of a federal statute, particularly one that specifically provides that it is to take precedence over every other provision of the Medicaid laws. The provisions of the MCCA establishing the CSRA and the maximum monthly income levels for the community spouse, by expressly stated intent, take precedence. Moreover, Section 3258.9(B) of the State Medicaid Manual does not itself provide that a transfer of assets to an actuarially sound annuity establishes that the transfer may not under any circumstances render ineligible an ap-

Medicaid law set forth at 42 U.S.C. § 1396p.

**2.** Obviously, if this were true, the federal mandate that MA is reserved for "needy persons" would be completely erased.

plicant for MA. As we read the provision, it is simply a guideline to aid caseworkers in determining whether or not an annuity appears on its face to be a legitimate instrument as opposed to an abusive shelter for assets. This does not mean that the purchase of a legitimate instrument from available assets must, in all circumstances, render those assets unavailable for purposes of determining MA eligibility. In sum, the Dempseys' reliance upon a single guideline in isolation may not render the remaining provisions of the Medicaid laws and the essential and precedential provisions of the MCCA meaningless.

The final administrative order of DPW is therefore affirmed.

### ORDER

AND NOW, this 15th day of May, 2000, the order of the Pennsylvania Department of Public Welfare in the above-captioned matter is hereby affirmed.