NEW YORK CITY HEALTH AND HOSPITALS CORP., Plaintiff-Appellant,

v.

Barbara A. BLUM, as Commissioner of Social Services of the State of New York, David Axelrod, as Commissioner of Health of the State of New York, Howard F. Miller, as Director of the Budget of the State of New York, and Patricia R. Harris, as Secretary of the United States Department of Health and Human Services, Defendants-Appellees.

No. 795, Docket 82–6257.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1983.
Decided May 25, 1983.

Peter F. Nadel, New York City (Rosenman, Colin, Freund, Lewis & Cohen, New York City, of counsel), for plaintiff-appellant.

J.D. Pope, Asst. U.S. Atty., S.D.N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Michael H. Dolinger, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for defendant-appellee Secretary of the Dept. of Health and Human Services.

Neal Johnston, Asst. Atty. Gen., State of N.Y., New York City (Robert Abrams, Atty. Gen. State of N.Y., New York City, of counsel), for defendants-appellees Barbara B. Blum, David Axelrod, and Howard F. Miller.

Before VAN GRAAFEILAND, PIERCE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

New York City Health and Hospitals Corporation (HHC) appeals from Judge Brieant's dismissal of its five count complaint alleging the invalidity of certain provisions of the New York State Plan for Medical Assistance, (State Plan), N.Y.Admin.Code, tit. 10, § 86 (approved Jan. 1, 1980). We affirm.

## BACKGROUND

HHC is a public benefit corporation which operates fourteen municipal hospitals and numerous health care facilities in the City of New York. Because it is the primary provider of medical services to the city's poor, it also receives substantial reimbursements from the federal government under the Medicaid Act, 42 U.S.C. §§ 1396–1396n (1976 and Supp. IV 1980). Of the three million in-patient days of care provided annually by HHC, roughly 60 percent of that care goes to Medicaid-eligible patients. Of the Medicaid days of care provided by New York State, 40 percent is accounted for by HHC.

Under the Medicaid Act in effect at the time of HHC's complaint, the State was required to establish a plan to formulate and pay HHC's "reasonable costs" for Medicaid patients. According to the State Plan, N.Y.Admin.Code, tit. 10, § 86 (1980), which has been statutorily approved by the Secretary of Health and Human Services (Secretary), Medicaid reimbursements were calcu-

lated through a complex formula which yielded prospective rates at which Medicaid services would be reimbursed. Under this formula, the rate for a particular hospital for a coming year (rate year) is derived from the costs it incurred in the year two years prior to that coming year (base year). Thus, the reimbursement rate for the rate year 1980 would be derived from the hospital's costs in the base year 1978.

For the years relevant to this case, 1980 and 1981, the formula determined a hospital's reimbursement rate by dividing its base year "allowable" costs related to patient care by total patient days. The result, adjusted for matters not relevant here such as the rate of inflation, yielded the *per diem* reimbursement rate for the rate year.

Complexity arose, however, in calculating reasonable costs under Medicaid so as to exclude costs inflated by the inefficient provision of services. To determine which costs were to be so disallowed, the State utilized a three-step process. First, it determined so-called disallowance ceilings on "routine" and "ancillary" costs. Routine costs are "hotel like" expenses of caring for patients—food, laundry, etc. A hospital's total routine costs were divided by its total number of patient days to reach a facility routine *per diem* cost. This *per diem* cost was then compared to similar costs accrued by similarly situated hospitals, the recipient hospital's so-called peer group. A peer group average *per diem* routine cost was calculated, and a ceiling of 105 percent of that peer group average established. To the extent a particular hospital's routine *per diem* costs exceeded 105 percent of its peer group average, the excess was disallowed. The *per diem* excess would then be multiplied by total patient days, that sum subtracted from total routine costs, thereby yielding allowable routine costs.

Similar calculations were made with respect to ancillary costs. These are the costs of specific care required by particular patients and include operating room, x-ray and pharmacological expenses. Whereas routine costs were divided by patient days to reach a *per diem* rate, the formula divided total ancillary costs by the number of discharges in a particular year to reach a per patient rate. Again, after calculating actual facility costs and average peer group costs, a disallowance ceiling on ancillary costs was set at 105 percent of the peer group average. Total disallowed costs were then calculated, subtracted from total ancillary costs, yielding allowable ancillary costs.

Prior to determining the routine *per diem* and ancillary per patient figures to which the disallowance ceilings were applied, both figures were altered by "imputing" days or, in the case of ancillary costs, discharges to the hospital. This step in the formula was designed to reduce the enormous costs generated by hospitals which maintain an excessive number of hospital beds. A normative benchmark occupancy level was determined on the basis of (1) the use to which a bed was subject and (2) the location and pedagogical function of the hospital. Thus, in a downstate non-teaching hospital for which rates were being calculated in 1980, the benchmark occupancy levels for medical/surgical beds, maternity beds, and pediatric beds were 85 percent, 75 percent, and 70 percent, respectively. To the extent a hospital in a particular category failed to reach the specific benchmark, additional use was imputed and the imputed days or discharges became part of the routine and ancillary cost calculations. To avoid this penalty, a hospital could decertify an appropriate number of beds.

If the formula contained no further steps, allowable routine and ancillary costs would be added and the sum divided by the sum of total patient days to reach the *per diem* prospective reimbursement rate for Medicaid patients in particular hospitals. The record indicates that Blue Cross reimbursed hospitals for insured patients by an analogous method.

Prospective *per diem* reimbursement, however, created incentives in hospitals to increase patient lengths of stay. First, since reimbursement by Blue Cross and Medicaid is provided on a flat *per diem* basis and some costs are "frontloaded" (*e.g.,* admission expenses) while others tend to

decline over length of stay (*e.g.*, nursing care), prolonged lengths of stay of Blue Cross or Medicaid patients yield greater net revenues to hospitals than short stays. Second, the State Plan's attribution of imputed days or discharges as a consequence of unused beds itself created an incentive to increase the lengths of stay of all patients. Relevant studies tended to show, moreover, that these incentives were in fact affecting patient lengths of stay. *See* Dowling, *et al., Prospective Reimbursement in Downstate New York and Its Impact on Hospitals—A Summary,* Report to the Social Security Administration, Department of HEW, Contract No. HEW–OS–74–248; Berry, *Prospective Rate Reimbursement and Cost Containment: Formula Reimbursement in New York,* 13 Inquiry 288 (1976).

To reduce these incentives, yet a third disallowance ceiling, the legality of which is the central issue in this litigation, was devised. Beginning in 1977, the State Plan utilized a "length of stay" (LOS) disallowance to eliminate costs attributable to excessively prolonged hospitalizations in the base year. Over time the methodology of determining the LOS disallowance was modified to increase its precision. The 1980 (rate year) LOS methodology worked as follows. First, each hospital in the state was placed in one of four peer groups—upstate teaching, upstate nonteaching, downstate teaching, downstate nonteaching. Second, using Medicaid and non-Medicaid patient data, the 1978 (base year) discharge information was segregated into 493 age/diagnostic categories or cells. The upper one percent of the cases in each cell were eliminated to factor out aberrant cases, and an average LOS was determined for each cell. Third, each hospital's unique patient discharge information was multiplied by the peer group average for each cell. The products were added and that total was divided by the hospital's total number of patients to achieve an expected average LOS unique to the hospital's patient mix. Finally, each hospital's actual average LOS was compared to its expected average LOS and to the extent the total of actual days exceeded the expected days by more than one day, the excess was disallowed. The total of excess days in the base year was multiplied by the hospital's routine *per diem* costs and that figure was subtracted from the hospital's total projected costs used to calculate the *per diem* reimbursement for the rate year.

Routine and ancillary cost ceilings, the imputing of bed use and the LOS disallowance thus determined prospectively the Medicaid reimbursement rates. In addition to prospective ratemaking, however, retrospective review of Medicaid reimbursement claims was authorized by a separate subchapter of the Social Security Act, 42 U.S.C. § 1320c (1976). This provision authorized the Secretary to designate areawide Professional Standards Review Organizations (PSROs) for purposes of determining whether particular services provided under the Act to particular patients were medically necessary and effectively delivered. PSROs were charged with oversight responsibilities as to virtually all elements of the health care services system, including lengths of stay. In 1977, the Act was amended to make any reviews conducted by a PSRO "conclusive ... for purposes of payment" under the Act, 42 U.S.C. § 1320c–7(c) (Supp. III 1979), a provision which is said by HHC to invalidate the LOS disallowance. Of HHC's hospitals, thirteen had functioning PSROs commencing at various points in the late 1970s.[1] Of these, six were affected in the rate years 1980 and

---

1. The facilities, along with the dates on which PSRO review began, were as follows:

| Facility | PSRO Review |
|---|---|
| 1. Bellevue Hospital | 6/4/79 |
| 2. Bronx Municipal Hospital | 8/9/77 |
| 3. Harlem Hospital | 9/15/81 |
| 4. Kings County Hospital | 1/24/78 |
| 5. Queens General Hospital | 2/12/79 |
| 6. Sydenham Hospital | 8/27/79 |
| 7. Coney Island Hospital | 12/29/77 |
| 8. Cumberland Hospital | 12/2/77 |
| 9. Elmhurst Hospital | 1/1/79 |
| 10. Greenpoint Hospital | 12/29/77 |
| 11. Lincoln Hospital | 1/10/78 |
| 12. Metropolitan Hospital | 12/16/76 |
| 13. North Central Bronx Hospital | 6/27/77 |

1981 by the addition of the LOS disallowance to the State Plan formula.[2]

## HHC'S COMPLAINT AND PROCEEDINGS BELOW

On September 29, 1980, HHC filed a five count complaint. Count I, as amended and supplemented by count IA, alleged that the LOS disallowance violated the statutory provision rendering PSRO reviews conclusive and the Medicaid Act's requirement that hospitals be reimbursed for their reasonable costs. The PSRO Act has now been amended to eliminate PSRO review in Medicaid cases and HHC has limited its claim for lost reimbursements to the rate years 1980 and 1981.

Count II alleged that the LOS disallowance itself denied reimbursements for reasonable costs. Count III alleged that the Secretary's approval of the State Plan was arbitrary and capricious because it did not specifically set forth how the LOS disallowance was computed. Count IV alleged that New York had violated the Medicaid Act by failing to consult with the Medical Care Advisory Committee (MCAC). Finally, count V alleged that PSRO review resulted in the denial of HHC's reasonable costs because fixed capital and maintenance costs associated with a PSRO disallowed day are excluded.

In a series of opinions, Judge Brieant dismissed the five count complaint. After an unsuccessful effort to certify for interlocutory review the issue of HHC's standing to bring counts I and IA, *see New York City Health and Hospitals Corporation v. Blum,* 678 F.2d 392 (2d Cir.1982), HHC stipulated that it would not seek to prove actual reasonable costs as a fact under counts I–IV. Under the stipulation,[3] HHC limits its argument to a claim for a declaratory judgment that, if the LOS disallowance is invalidated for any reason, the *per diem* rate calculated according to the State Plan but without the LOS disallowance is as a matter of law "reasonable costs" under the Medicaid statute.

Although Judge Brieant agreed with HHC that the LOS disallowance and PSRO review were in conflict, he dismissed counts I and IA for lack of standing on the grounds that HHC was not injured in a legally cognizable fashion unless it alleged and was prepared to prove as a fact that the disallowance denied it reimbursement for its actual reasonable costs. Count II was dismissed because the district court

2. The hospitals affected in the rate years 1980 and 1981 were:
   1. Bellevue
   2. Bronx Municipal
   3. Harlem
   4. Kings County
   5. Queens General
   6. Sydenham Hospital

3. HHC's counsel submitted an affidavit to the District Court stating in part:

   If ... the Court concludes that HHC is not entitled to its "reasonable costs" as determined by the State Plan provisions without the unlawful LOS penalty, HHC requests that Final Judgment be entered against it. HHC hereby waives and foregoes its right to (i) prove at trial that its reimbursement in 1980 and 1981, as lowered by the LOS disallowance, is "unreasonable"; (ii) prove at trial that reimbursement determined by the State Plan provisions without the LOS penalty (or even some greater amount) is "reasonable"; and (iii) offer any proof in rebuttal to Defendants' showing to the contrary. Annexed hereto as Exhibit C is the Stipulation dated May 18, 1982, pursuant to which HHC formally waives and foregoes these rights.

   [I]f Judgment is entered for Defendants on the foregoing basis, such Judgment should also be entered on *all* Counts of the Complaint. It does not make the slightest bit of difference whether the LOS penalty is unlawful because (i) it violates the PSRO Act (Counts I and I–A), (ii) constitutes a double penalty and improperly disallows fixed costs (Count II), (iii) is not included in the State Plan "methods and standards" (Count III), or (iv) was not approved by the Medical Care Advisory Committee (Count IV). Whatever the basis for the illegality, Defendants will still contend that HHC must first show that its unlawfully lowered reimbursement was "unreasonable in fact" before it can obtain relief. That horrendous burden, and the delay inherent therein, HHC respectfully declines to bear. The Medicaid Act makes it unnecessary.

   At the time this affidavit was filed, count V had already been dismissed by Judge Brieant. We affirm that dismissal for the reasons stated by him.

viewed reasonable costs as a factual issue better resolved "on a plenary trial record." Count III was dismissed on the merits, the court concluding that the Secretary had approved the LOS disallowance prior to approving the state plan. Count IV was deferred pending a plenary trial since the remedy for any asserted failure to consult MCAC would become more apparent, or the claim would be shown to be ephemeral, after such a trial. Finally, count V was dismissed on the merits, Judge Brieant concluding that the PSRO Act excluded both fixed and routine costs for all days disallowed by the Act.

## DISCUSSION

HHC has limited its claims for relief on counts I–IV to a request for a judgment that the LOS disallowance is unlawful *and* that the sole lawful rate of reimbursement is the amount prescribed by the State Plan without the LOS disallowance.[4] HHC thus eschews any claim that *as a fact,* rather than as a matter of law, the LOS disallowance leads to reimbursement below its reasonable costs and abandons any claim for other relief to which it might be entitled, *e.g.,* an order requiring consultation with the MCAC. As to each of counts I–IV, therefore, a finding that either the LOS disallowance is valid or that HHC is not entitled to a monetary award absent proof of its actual reasonable costs is sufficient to affirm Judge Brieant.

As to counts I and IA, we may assume for purposes of discussion that a state plan which directly overruled PSRO determinations would be illegal and lead to the relief sought by HHC. For example, in the hypothetical case of a hospital with only Medicaid patients and with an operational PSRO during the base year and rate year which approved the length of stay of each patient during the base year, any LOS disallowance would be derived solely from Medicaid patients' lengths of stay ratified by a PSRO

and thus be ostensibly inconsistent with the PSRO's statutorily "conclusive" authority. If so, a plausible argument could be made that the *per diem* reimbursement rate of the plan, which has been adjusted for all inefficiencies save excessive lengths of stay, less the LOS disallowance, represents the reasonable costs provided for by the Medicaid statute.

We need not resolve the legality of this hypothetical LOS disallowance, however, for critical differences exist between it and the instant case. To begin, of the five HHC hospitals affected by the 1980 reimbursement, only one had a PSRO in the base year 1978. Of the four affected in the rate year 1981, only two had PSROs functioning throughout the base year 1979. HHC glosses over these damaging facts by assuming that an LOS disallowance is inconsistent with PSRO authority in the rate year, an assumption which is plainly wrong. For example, if a hospital had a PSRO in 1980 but not in 1978, application of an LOS disallowance based on 1978 data would not be inconsistent with any PSRO determination in 1980 even if it reduced the 1980 reimbursement rate. The LOS disallowance would simply reduce the inflation of the 1980 *per diem* rate caused by excessive lengths of stay in 1978. PSRO decisions in 1980 would not be affected and the reimbursement to the hospital—PSRO approved days *x* corrected *per diem* reimbursement rate—would be unchallengeable. The fact that HHC did not have a PSRO in most of the affected hospitals during large portions of the base years in question thus thoroughly undercuts its facial claim that all LOS disallowances for 1980 and 1981 must be invalidated.

In addition, the actual LOS disallowance is not in facial conflict with PSRO authority since it is designed to counteract disincentives relating to lengths of stay of all patients, not just those whose care is subsidized by Medicaid. These disincentives were created by the reimbursement meth-

---

4. We reach the merits but to the extent that this action is a stalking horse for a state action for damages, we frown upon resort to the equitable remedy of a declaratory judgment in a federal court. *See Hospital Association of New York State, Inc. v. Toia,* 577 F.2d 790, 798 (2d Cir.1978).

ods of private insurers and by other aspects of the State Plan formula. As explained above, the method of prospective ratemaking utilized by Blue Cross also created incentives which resulted in the prolonging of patient lengths of stay in order to increase net revenues to hospitals. Moreover, the State Plan's use of imputed days and discharges for the underutilization of existing and costly facilities created a further incentive in hospitals to prolong lengths of stay of all patients, thereby avoiding the penalty, rather than to close down excess facilities.

■ Unlike the disallowance in the hypothetical case, therefore, the LOS disallowance here has purposes intimately woven into the fabric of the State Plan viewed as a whole and is not limited to lengths of stay of Medicaid patients. Indeed, if the State Plan and PSROs operate as planned, the LOS disallowance cannot deprive a hospital of its reasonable costs for Medicaid patients. So long as the LOS formula is reasonable—HHC disclaims any challenge to it—and the PSROs are fulfilling their duties—we doubt that HHC would have us indulge in a contrary assumption—any resulting LOS disallowance *must* stem solely from excessive lengths of stay of *non*-Medicaid patients. HHC concedes this syllogism is a "theoretical" possibility, a concession which, in the context of a facial challenge, is not without significance. Nevertheless, it is obviously too limited a concession. Either the assumptions as to LOS and PSRO accuracy are wrong or the conclusion is correct. On this record, there is clearly no basis to reject these assumptions.

■ The above is dispositive as to counts I and IA. We may dispose of counts II–IV in more summary fashion. They assert the illegality of the LOS disallowance on the grounds that it prevents reimbursement of reasonable costs, was approved by the Secretary in a technically incorrect fashion and was adopted without consultation with the MCAC. Absent a factual showing as to HHC's actual reasonable costs, however, none of these claims would support a declaratory judgment for HHC. As to count

II, we agree with Judge Brieant that on its face it calls for the very proof HHC declines to offer. As to III and IV, it flies in the face of logic and legislative purpose to suggest that having held one aspect of an integrated formula void on procedural grounds, we should direct reimbursement calculated solely by those parts of the formula which remain, no matter how excessive that reimbursement in fact or how irrebuttable the evidence that the reimbursement even exceeds actual costs, much less the "reasonable costs" dictated by the Medicaid statute. Such an outcome would compel third party payors such as the defendants here to place their treasuries in peril by utilizing any formula which contained elements reducing reimbursement, for any such formula would merely establish a high floor for reimbursements. We perceive no reason to attribute to the words "reasonable costs" so bizarre an interpretation.

Affirmed.