**Etheleine J. MERTZ, by her next friend and Attorney–In–Fact Charles M. MERTZ,**

v.

**Feather O. HOUSTOUN, Secretary of the Pennsylvania Department of Welfare.**

No. CIV.A. 01–2627.

United States District Court, E.D. Pennsylvania.

July 30, 2001.

Stanley M. Vasiliadis, Bethlehem, PA, for Plaintiff.

Andrew A. Coates, Office of Legal Counsel, Dept. of Public Welfare, Philadelphia, PA, for Defendant.

### MEMORANDUM

WALDMAN, District Judge.

#### I. *Introduction*

Plaintiff has asserted claims for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. She alleges that defendant has violated Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, in determining her eligibility for Medicaid benefits. Plaintiff asserts federal question jurisdiction pursuant to 28 U.S.C. § 1331.

Plaintiff seeks a declaration that defendant's decision that plaintiff is ineligible for Medicaid until January 1, 2002 because of her husband's purchase of annuities with joint assets in November 1999 is "illegal, null and void." Plaintiff also filed a motion for a preliminary injunction and in her complaint asked for a temporary restraining order to enjoin defendant from denying Medicaid benefits in the interim to plaintiff who is now in a nursing home.[1]

#### II. *Factual Background*

Pennsylvania participates in the federally organized Medicaid program whereby states are granted federal funding for establishing plans to dispense assistance to qualifying needy individuals. Funding is conditioned on the adoption of a plan which complies with specific federal requirements. The Department of Public Welfare ("DPW") is the Pennsylvania regulatory body charged with administering Medicaid assistance throughout the Commonwealth. *See* 62 P.S. § 403. Defendant is the Secretary of the DPW.

Plaintiff entered nursing home care on May 19, 1999. Her husband purchased two irrevocable commercial annuities with $106,600 of joint assets on November 19 and November 29, 1999 respectively. The term of each annuity is five years. They pay just under $2,000 per month for a total payout of $119,917.80. The total earnings of $13,318 reflect an annual rate of return of just under 2.5%. Plaintiff's husband is the sole beneficiary. There appears to be no designated residual beneficiary. At the time, he had a life expectancy of 9.4 years. Almost immediately thereafter, on December 1, 1999, plaintiff moved to a "participating" facility, that is a nursing home which participates in the Medicaid program.

Plaintiff filed an application with the DPW on March 31, 2000 for Medicaid coverage. On May 4, 2000 the DPW determined that plaintiff was eligible for Medicaid assistance effective January 1, 2000. After review by a superior official, the DPW determined on June 14, 2000 that its prior decision had been in error and that plaintiff would not be eligible for assistance until January 1, 2002.

Plaintiff timely appealed the DPW decision. Her appeal was denied by order of November 28, 2000, accompanied by a formal opinion captioned "Adjudication." Upon reconsideration, the Secretary upheld the decision by order of May 11, 2001 and informed plaintiff that she could appeal to the Pennsylvania Commonwealth Court within thirty days. Pennsylvania provides for direct judicial review of such administrative decisions. *See* 42 Pa.C.S.A. § 763(a); 55 Pa.Code § 275.3.

#### III. *Basis of Plaintiff's Claim*

Plaintiff asserts that in making its decision, the DPW violated 42 U.S.C.

---

1. The court treated this request as a motion for a temporary restraining order and afforded the parties an opportunity to be heard.

§§ 1396p(c)(1) and (c)(2). Section 1396p(c)(1) requires that participating states recognize a period of ineligibility for benefits for individuals who transfer assets for less than fair market value during a specified time-frame. Section 1396p(c)(2) provides in pertinent part that an individual shall not be deemed ineligible for a transfer of assets for less than fair market value if the assets were transferred to the individual's spouse or to another for the sole benefit of the spouse, if the individual intended to dispose of the assets for valuable consideration or if the assets were transferred exclusively for a purpose other than qualifying for medical assistance. These provisions are mirrored in the Pennsylvania Public Welfare Code. *See* 55 Pa. Code § 178.104.

Plaintiff also points to the Health Care Financing Administration ("HCFA") State Medicaid Manual, known as "Transmittal 64," a directive issued by the Secretary of the Department of Health and Human Services ("DHHS") which provides guidance for determining whether an annuity was purchased for fair market value. *See* State Medical Manual, Health Care Financing Administration Pub. 45–3, Transmittal 64 (Nov. 1994), § 3258.9(B). The key criteria is actuarial soundness. It provides that "[i]f the expected return on the annuity is commensurate with a reasonable estimate of the life expectancy of the beneficiary, the annuity can be deemed actuarially sound" and thus a purchase for "fair market value." This directive is mirrored

by § 440.97 of the DPW Nursing Care Handbook.

Plaintiff argues the annuities are for the sole benefit of her spouse, are actuarially sound and were purchased for fair market value, and that defendant thus violated federal law by penalizing her with a period of ineligibility for benefits for twenty-four months based upon the purchase price of the annuities.[2]

The DPW made an express finding of fact that the annuities were purchased for fair market value. The DPW concluded that it could nevertheless penalize plaintiff upon a determination that the purchase of the annuities reflected a transfer of assets for the purpose of qualifying for Medicaid assistance.

The DPW relied upon provisions of the Medicare Catastrophe Coverage Act of 1988 ("MCCA"), 42 U.S.C. § 1396r–5, and corresponding Pennsylvania regulations.[3] In reaching its conclusion, the DPW also relied on recent Pennsylvania Commonwealth Court opinions in *Bird v. Department of Public Welfare,* 731 A.2d 660 (Pa. Commw.1999) and *Dempsey v. Department of Public Welfare,* 756 A.2d 90 (Pa. Commw.2000). These opinions seem to suggest that the purchase price of annuities for the benefit of a non-institutionalized or "community" spouse at fair market value may still be a countable resource in determining eligibility if the purchase was made for the purpose of qualifying for medical assistance.[4] Plaintiff contends

---

**2.** Plaintiff does not challenge the concomitant determination of ineligibility for three months because of the transfer of $18,000 to plaintiff's two daughters for no consideration in the fall of 1999.

**3.** These provisions actually provide a method for calculating resources deemed available to an institutionalized spouse when determining eligibility for medical assistance. They do not

explicitly address transfers of assets or provide for the imposition of penalties.

**4.** The actual decision in each case was predicated on a determination that the plaintiffs there had transferred assets to purchase annuities for less than fair market value. *See Dempsey,* 756 A.2d at 95; *Bird* 731 A.2d at 669 (noting that the beneficiary would receive only $600 in interest over six years on a $143,400 annuity).

that these opinions are wrong and that the DPW may not scrutinize the intent behind an annuity purchase after it concludes the purchase was for fair market value or the sole benefit of a spouse without violating the Pennsylvania Medicaid plan and federal requirements on which it is based.

## IV. *Basis for Federal Question Jurisdiction*

"[F]ederal courts have an ever-present obligation to satisfy themselves of their subject matter jurisdiction and to decide the issue *sua sponte.*" *Liberty Mut. Ins. Co. v. Ward Trucking Corp.,* 48 F.3d 742, 750 (3d Cir.1995). *Accord American Policyholders Ins. v. Nyacol Products,* 989 F.2d 1256, 1258 (1st Cir.1993) ("a federal court is under an unflagging duty to ensure that it has jurisdiction"); *Steel Valley Authority v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3d Cir.1987) ("lack of subject matter jurisdiction voids any decree entered in a federal court"); *Wisconsin Knife Works v. National Metal Crafters,* 781 F.2d 1280, 1282 (7th Cir. 1986).[5] To determine conscientiously the existence of subject matter jurisdiction in the instant case, the court must examine the essence of plaintiff's claim against the backdrop of pertinent federal and state Medicaid law.

Title XIX of the Social Security Act, or the Medicaid Act, is a co-operative federal-state program which is funded in large part by the federal government and administered by the states. *See Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).[6] While state participation in the program is voluntary, participating states must adopt plans that comply with certain requirements imposed by federal statutes and regulations. *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Thus, the actual program itself is "basically administered by each state within certain broad requirements and guidelines." *West Virginia Univ. Hosps. Inc. v. Casey,* 885 F.2d 11, 15 (3d Cir.1989). This case implicates the provisions of the Act regarding transfers of assets by Medicaid applicants or their spouses and the resources deemed available to a married couple to pay for the nursing care costs of one spouse.

Sections 1396p(c) & (d) of the Medicaid Act discuss transfers of assets and the treatment of annuities. Section 1396p(c)(1) requires states to establish periods of ineligibility for transfers of assets made for less than fair market value during a certain time period up to the application for Medicaid assistance, known as the "look back period." [7] Section 1396p(d) dis-

---

5. The court noted its concern regarding jurisdiction at the hearing and invited the parties to submit any pertinent authority or argument on the issue. Plaintiff submitted a memorandum citing several cases which she contends support an exercise of jurisdiction. Defendant submitted no response and has not explicitly asserted lack of jurisdiction. She has pled Eleventh Amendment immunity and failure to state a cognizable claim as defenses in her answer.

6. The Medicaid Act is actually a morass of interconnecting legislation. It contains provisions which are circuitous and, at best, difficult to harmonize. The Act has been called "an aggravated assault on the English lan-

guage, resistant to attempts to understand it." *See Schweiker v. Gray Panthers,* 453 U.S. 34, 43, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). The Medicaid Act has been characterized as one of the "most completely impenetrable texts within human experience" and "dense reading of the most tortuous kind." *Rehabilitation Ass'n of Va. v. Kozlowski,* 42 F.3d 1444, 1450 (4th Cir.1994). The court has nothing but sympathy for officials who must interpret or administer the Act.

7. The "look back" date is, in most cases, 36 months prior to the day that the institutionalized individual applies for Medicaid.

cusses how trusts are to be treated under the Act, particularly with respect to the transfer of asset provisions of subsection (c). It states that an annuity may be considered a trust "only to such extent and in such manner as the Secretary specifies." 42 U.S.C. § 1396p(d)(6). The only specification in this regard ever provided by the Secretary is Transmittal 64.

Transmittal 64 states in pertinent part: [a]nnuities, although usually purchased to provide a source of income for retirement, are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid. In order to avoid penalizing annuities purchased as part of a retirement plan but to capture those annuities which abusively shelter assets, a determination must be made with respect to the ultimate purpose of the annuity (i.e. whether the purchase of the annuity constitutes a transfer of assets for less than fair market value). If the expected return on the annuity is commensurate with a reasonable estimate for the life expectancy of the beneficiary, the annuity can be deemed actuarially sound.

HCFA Guidelines § 3258.9(B).

Certain asset transfers for less than fair market value will nevertheless be exempt from penalty if they satisfy one of the criteria specified in § 1396p(c)(2). Among these exemptions are assets transferred to an institutionalized individual's spouse or to another "for the sole benefit" of the spouse. *See* 42 U.S.C. § 1396p(c)(2)(B)(i). Section 3257(B) of Transmittal 64 sets out the Secretary's definition of transfers made "for the sole benefit" of a spouse. Actuarial soundness remains the key factor in making this determination with regard to annuities.

The MCCA amended the Medicaid Act to establish a mechanism to protect couples from being forced to deplete their assets to qualify for Medicaid. It accomplishes this in part with so-called impoverishment provisions by which a portion of a couple's resources are protected and not considered available to pay for nursing care expenses. *See* 42 U.S.C. § 1396r–5. This protected amount in known as the community spouse resource allowance ("CSRA").

■ Another purpose of the Act is to prevent an institutionalized spouse from qualifying for Medicaid by transferring his or her interest in assets to the community spouse. *See* H.R.Rep. No. 100–105(II), 100th Cong., 2nd Sess., at 73–74 (1987) *reprinted in* 1988 U.S.C.C.A.N. 857, 896–87; *Johnson v. Guhl*, 91 F.Supp.2d 754, 761 (D.N.J.2000) (with the MCCA "Congress intended to close the loophole where a couple could shelter resources in the community spouse's name while the institutionalized spouse received Medicaid"). This goal is achieved by considering all resources of both spouses over and above the CSRA to be available to pay for nursing care costs of the institutionalized spouse. *See* 42 U.S.C. §§ 1396r–5(c)(1)(A) & (c)(2). The provisions of the MCCA supercede all other conflicting provisions of the Medicaid Act. *See* 42 U.S.C. § 1396r–5(a)(1).

With respect to transfers between spouses under § 1396p(c)(2)(B)(i), Transmittal 64 notes that "the unlimited transfer exception should have little effect on the eligibility determination, primarily because resources belonging to both spouses are combined in determining eligibility for the institutionalized spouse." HCFA Guidelines § 3258.11. It also recognizes that in contrast, "[t]he exception for transfers to a third party for the sole benefit of the spouse may have greater impact on eligibility because resources may potentially be placed beyond the reach of either spouse

and thus not be counted for eligibility purposes." *Id.*

As noted, Pennsylvania has promulgated regulations that mirror the Medicaid Act provisions at issue. Section 178.104 of the Public Welfare Code covers transfers of assets for less than fair market value and contains the identical "look back" provisions as those in § 1396p(c)(1). Section 178.104(e) mirrors the exclusion provisions of § 1396p(c)(2). The DPW Nursing Care Handbook mirrors the Transmittal 64 provisions regarding the purchase of annuities. Pennsylvania has also promulgated regulations that incorporate the pertinent provisions of the MCCA. The provisions in §§ 1396r–5(c)(1)(A), (c)(2) & (f)(2) establishing the CSRA and a method for attributing resources in determining Medicaid eligibility are reflected in 55 Pa.Code §§ 178.1 & 178.123–178.25.

Although finding that the annuities at issue were purchased for fair market value, the DPW used the look back period to examine the circumstances surrounding the purchase. Based upon the timing and transfer of other assets for less than fair market value, the DPW made the presumption that the annuities were purchased for the purpose of qualifying for Medicaid. The DPW found that plaintiff had not rebutted the presumption and calculated a twenty-four month period of ineligibility based upon the annuity purchases.[8]

In its Adjudication, the DPW concluded that the "sole benefit of the spouse" exemption in § 1396p(c)(2)(B), as reflected in § 178.104, was superceded by the CSRA provisions of the MCCA. The DPW then focused on the language regarding an exception for a transfer for a purpose other than qualifying for assistance, but seemed to ignore that this is an exception to ineli-

gibility due to a transfer for less than fair market value. The DPW also cited to 55 Pa.Code § 178.105 which is captioned "Presumption of Disposition of Assets to Qualify for Medical Assistance." This regulation permits the DPW to make the noted presumption and provides for rebuttal by the applicant. It is unclear whether this provision is to be applied only in tandem with § 178.104(e) upon a finding of a transfer for less than fair market value or was intended to create a distinct and discrete basis for assessing eligibility. There is no parallel reference in the Medicaid Act or regulations.

The DPW thus effectively employed a test which penalizes an applicant for either making a transfer for less than fair market value *or* to qualify for benefits. Indeed, counsel for the DPW confirmed at the hearing that the DPW routinely considers the intent behind an annuity purchase in determining eligibility regardless of whether it was actuarially sound and purchased for fair market value, as it scrutinizes each asset transfer during the look back period.

■ The court certainly has subject matter jurisdiction over a claim under 42 U.S.C. § 1983 that a plaintiff has been deprived of a right secured by the Constitution or laws of the United States. *Blessing v. Freestone,* 520 U.S. 329, 341, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). By its terms, however, the Medicaid Act does not explicitly guarantee rights to individuals. Rather, it compels participating states to draft a plan in conformity with federal law.

■ "The fact that federal law conditions State participation in the Medicaid program on the State's adoption of a Medicaid plan does not thereby transform pro-

---

**8.** The total ineligibility period was calculated at twenty-seven months but this included three months of uncontested ineligibility for the transfers of cash to plaintiff's daughters.

visions of a State's plan into federal law." *Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono,* 179 F.3d 38, 44 (2d Cir.1999). "Were it otherwise, federal jurisdiction could be invoked to review each claimed error in a State's administration of its Medicaid Plan, which would needlessly undermine State sovereignty." *Id.* Thus, the only enforceable right is to a state plan that comports with federal requirements and not to challenge any deviation by a state from a plan which itself comports with federal law. *See Clifton v. Schafer,* 969 F.2d 278, 284–85 (7th Cir.1992). A claim that a state has misapplied its plan does not present a federal question. *See Concourse Rehab.,* 179 F.3d at 46.

Plaintiff acknowledges that the Pennsylvania plan has corresponding regulations for each federal statutory requirement she cites in her complaint and on which she relies. She has not challenged the legality of the Pennsylvania plan. What plaintiff contends is that despite a conforming state plan, the DPW actually "follows an unpublished different policy" of "penalizing fair market value transfers of excess resources" which conflicts with federal requirements.

Plaintiff has proffered several cases to support her assertion of jurisdiction. These cases, however, involve facial challenges to the legality of a state plan or an apparent exercise of supplemental jurisdiction.

*King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) involved a claim that a state AFDC regulation conflicted with a requirement of federal law. *See id.* at 333, 88 S.Ct. 2128. *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) involved a claim that an express provision of a state welfare law rendered the state AFDC program incompatible with federal law. *See id.* at 399, 419–20, 90 S.Ct. 1207.

*West Virginia Univ. Hosps., Inc. v. Casey,* 885 F.2d 11 (3d Cir.1989) involved a claim that the Pennsylvania plan on its face violated a federal mandate in § 1396a(a)(13)(A) regarding reimbursement of participating hospitals. It also involved a claimed violation of the equal protection clause over which a federal court clearly could exercise jurisdiction.

*Rochester v. Baganz,* 479 F.2d 603 (3d Cir.1973) involved a Fourteenth Amendment due process claim as well as a claim that a reduction of AFDC payments to plaintiff violated federal and state regulations. As to the latter claim, the district court had expressly exercised "pendent jurisdiction." *See Rochester v. Ingram,* 337 F.Supp. 350, 351 (D.Del.1972).

*Johnson v. Guhl,* 91 F.Supp.2d 754 (D.N.J.2000) involved a claim that a state plan failed to provide for "undue hardship" hearings as required by § 1396p(c)(2)(D). It also involved federal due process and equal protection claims over which the Court clearly had jurisdiction. In discussing jurisdiction, the Court clearly distinguished between claims that a state plan conflicts with federal law which present a federal question and claims that a state has violated provisions of its Medicaid plan which do not. *Id.* at 766. Plaintiff here has not alleged that the state plan itself is consistent with federal law.

Plaintiff also points to a sentence in the *Concourse Rehab.* opinion to suggest that a conflict between federal law and a state "practice" presents a federal question. That sentence reads "[t]o state a federal cause of action, a plaintiff must allege a specific conflict between a state plan or practice on the one hand and a federal mandate on the other," and is followed by a citation of *Oberlander v. Perales,* an earlier Second Circuit case. *See Concourse Rehab.,* 179 F.3d at 43–44. This is

not quite what the Court said in *Oberlander*. This language was used to characterize cases cited by plaintiffs. *See Oberlander v. Perales*, 740 F.2d 116, 119 (2d Cir. 1984) ("every precedent cited by [plaintiffs] has involved allegations of a specific conflict between a state plan or practice on the one hand and a federal mandate on the other"). The actual decision in *Oberlander* was that "[s]ince [plaintiff] alleges no conflict between the state plan and federal law, we dismiss the statutory claim." *Id.*[9]

In any event, the court is satisfied that there is federal jurisdiction to adjudicate a claim that despite adoption of a conforming Medicaid plan, a state routinely assesses eligibility in a manner which conflicts with federal law such that it has effectively supplanted its written plan with a contrary practice. If it were otherwise, a state could adopt a seemingly conforming plan, receive federal funding and then proceed routinely to employ different conflicting criteria free of federal judicial scrutiny despite the clear presence of a strong federal interest predicated on federal requirements. The federal requirement of a conforming state plan would be converted into a requirement that a state have a conforming written plan and then proceed with any

de facto plan which could withstand a state court challenge.

■ The same would be true of a claim that in the absence of any state plan provision addressing a particular federal requirement, a state proceeds as a routine practice to calculate eligibility in some manner which conflicts with federal law. *See Mont v. Heintz*, 849 F.2d 704, 709–10 (2d Cir.1988) (failure of state to employ standard of need set in compliance with federal law in calculating periods of ineligibility for AFDC recipients in manner contemplated by federal law constitutes "practice" violative of federal law). In short, the alleged adoption by a participating state of a practice which has the force of law or has become a de facto Medicaid plan provision and which conflicts with applicable federal law presents a justiciable federal question.

■ Plaintiff appended to her complaint the DPW Adjudication from which it appears that as a matter of practice or policy defendant penalizes the transfer of assets in determining eligibility in a manner which allegedly conflicts with federal Medicaid law.[10] This is sufficient to state a claim under § 1983 over which the court

---

9. Only one of the three cases cited by plaintiffs in *Oberlander* involved any reference to a conflict between a state "practice" or "policy" and federal law, and that case involved a state Medicaid appropriations statute which effectively prevented compliance with a federal Medicaid requirement. *See Massachusetts General Hosp. v. Sargent*, 397 F.Supp. 1056, 1060 (D.Mass.1975). *New York City Health & Hospitals Corp. v. Blum*, 708 F.2d 880 (2d Cir.1983) involved a length of stay provision in the state Medicaid plan which the Court noted could violate federal law if and as it undermined federal Professional Standards Review Organization ("PSRO") determinations. *See id.* at 885–86. *Massachusetts Ass'n. of Older Americans v. Sharp*, 700 F.2d 749 (1st Cir.1983) involved a termination of Medicaid benefits to a class of former AFDC

recipients in a manner inconsistent with federal regulations regarding redeterminations of Medicaid eligibility. *See id.* at 752–53. The offending action was based on a misinterpretation by the state of pertinent federal law, and there is virtually no discussion of the state plan. It thus appears that *Sharp* may fairly be characterized as a case involving a conflict between a state practice and federal law.

10. Plaintiff so characterized her claim in her accompanying motion for preliminary injunctive relief and defense counsel acknowledged at court proceedings that defendant acted in this case consistent with the alleged policy or practice.

has subject matter jurisdiction.[11] The Eleventh Amendment, of course, does not bar claims against state officials for declaratory or prospective injunctive relief based upon federal law. *See Edelman v. Jordan*, 415 U.S. 651, 667–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1996).

## V. *Plaintiff's Request for Interim Relief*

The factors considered in assessing a request for preliminary injunctive relief are well established. A court considers whether the movant has a reasonable probability of success on the merits; whether the movant will be irreparably harmed if relief is denied; whether a grant of relief will result in greater harm to the nonmovant; and, whether a grant of relief would be in the public interest. *See ACLU v. Reno*, 217 F.3d 162, 172 (3d Cir.2000). The burden is on the movant to establish all elements required for preliminary injunctive relief. *See Adams v. Free-dom Forge Corp.*, 204 F.3d 475, 486 (3d Cir.2000).[12]

There is a reasonable probability that plaintiff will prevail on the merits.

In its Adjudication, the DPW found that the annuities in question were purchased for fair market value but penalized the purchases nevertheless upon a determination that plaintiff had not rebutted a presumption that the purchases were made to qualify for benefits. Federal law, however, provides for a period of ineligibility predicated upon a transfer of assets during the look back period only for transfers made for less than fair market value and even then subject to certain exceptions. *See* 42 U.S.C. §§ 1396p(c)(1)(A) & (c)(2).

One of the exceptions is a transfer made exclusively for a purpose other than qualifying for benefits. *See* 42 U.S.C. § 1396p(c)(2)(C)(ii). In looking to intent despite a finding of fair market value, the DPW effectively converts the language of this exception to the penalization of a transfer for less than fair market value into an independent basis for imposing a period of ineligibility.[13] Another exception

---

**11.** Although not pled as such by plaintiff, insofar as § 178.105 is read independently of § 178.104(e) to penalize any transfer made to qualify for benefits, this could present a facial conflict between the state plan and federal law.

**12.** The test is the same for a grant of a temporary restraining order upon notice. *See The Nation Magazine v. Department of State*, 805 F.Supp. 68, 72 (D.D.C.1992); *Jackson v. National Football League*, 802 F.Supp. 226, 229 (D.Minn.1992); *Wright v. Columbia University*, 520 F.Supp. 789, 792–93 (E.D.Pa.1981); *Moore's Federal Practice* § 65.36 (3d ed. 2000). Indeed, upon notice and an opportunity to be heard, a motion for a TRO is properly treated as one for a preliminary injunction. *Id.* at § 65.31. *See also Earley v. Smoot*, 846 F.Supp. 451, 452 (D.Md.1994); *Delaware Valley Transplant Program v. Coye*, 678 F.Supp. 479, 480 n. 1 (D.N.J.1988).

**13.** The DPW seizes upon the portion of the sentence in Transmittal 64 which reads "a determination must be made with regard to the ultimate purpose of the annuity" but omits the language immediately following which reads "i.e. whether the purchase of the annuity constitutes a transfer of assets for less than fair market value." HFCA Guidelines § 3258.9(B). The Secretary makes clear that the critical factor in determining whether the purchase of an annuity may be penalized is whether it was a purchase for fair market value, which is then essentially equated with actuarial soundness. Insofar as the DPW relies on § 178.105 to penalize transfers made for fair market value and for the sole benefit of a spouse upon a finding they were also made to qualify for benefits, the agency is engaging in a practice inconsistent with federal law. Insofar as that regulation is intended not merely to create a rebuttable presumption of an intent to qualify upon a finding of a transaction for less than fair market value but

is a transfer of assets for the sole benefit of the community spouse. *See* 42 U.S.C. § 1396p(c)(2)(B). In its Adjudication, the DPW did not question plaintiff's claim that the transfer at issue was for the sole benefit of Mr. Mertz.

Rather, the DPW stated that the MCCA "supercedes all other Medicaid law provisions." This is clearly incorrect. The MCCA supercedes only prior "inconsistent" provisions of the Medicaid Act. *See* 42 U.S.C. § 1396r–5(a)(1). The DPW concluded that § 1396p(c)(2)(B) and the corresponding provisions in 55 Pa.Code § 178.104(e) specifically were superceded by the CSRA provisions in the MCCA. No less an authority than the Secretary of HHS disagrees.

In Transmittal 64, the Secretary states:

The exceptions to the transfer of assets penalties regarding interspousal transfers and transfers to a third party for the sole benefit of a spouse apply even under the spousal impoverishment provisions. Thus, the institutionalized spouse can transfer unlimited assets to the community spouse or to a third party for the sole benefit of the community spouse.

HFCA Guidelines § 3258.11.

The transfer provisions are not among those specifically identified in § 1396r–5(a)(1) as having been superceded. They are not inconsistent with the CSRA provisions which provide for a calculation based on assets in which either spouse has an ownership interest at the time of the application for benefits and which, viewed in conjunction with the look back provision, contemplate that some assets previously transferred may be uncountable in determining eligibility. Defendant seems to

concede as much by arguing only that the sheltering of otherwise available resources is contrary to the "purpose" of the MCCA. The Secretary of HHS, however, has recognized that it is nevertheless permitted.

After noting in Transmittal 64 that interspousal transfers should not impact eligibility since resources of both spouses are counted under the MCCA as available to the institutionalized spouse, the Secretary expressly recognized the potential for sheltering assets. She stated that "[t]he exception for transfers to a third party for the sole benefit of the spouse may have greater impact on eligibility because resources may potentially be placed beyond the reach of either spouse and thus not be counted for eligibility purposes." HFCA Guidelines § 3258.11. This is indeed achieved with the purchase of an actuarially sound irrevocable commercial annuity for the sole benefit of the community spouse.

■ Because at the time of application neither spouse has an ownership interest in the funds used to purchase such an annuity, the funds are not a countable resource in calculating the CSRA. Because the transfer was made to a third party for the sole benefit of the community spouse, it may not, consistent with federal law, be penalized or used to impose a period of ineligibility. *See Johnson,* 91 F.Supp.2d at 777–78 (contrasting such annuities with annuitized trusts where the corpus could be available at some point to the community spouse). As noted, the DPW also found that the Mertz annuities represented a transfer for fair market value which cannot be penalized consistent with federal law.[14] The return on the an-

---

rather to penalize transfers made for fair market value upon a presumption or finding of such intent, the regulation is inconsistent with federal law.

**14.** In discussing fair market value in Transmittal 64 in the context of a purchase of an annuity, the Secretary seems to have limited her focus to actuarial soundness. She refers

nuities is not countable as federal law provides that no income of the community spouse may be deemed available to the institutionalized spouse. *See* 42 U.S.C. § 1396r–5(b)(1).[15]

■ In short, a couple may effectively convert countable resources into income of the community spouse which is not countable in determining Medicaid eligibility for the institutionalized spouse by purchasing an irrevocable actuarially sound commercial annuity for the sole benefit of the community spouse. It is a loophole apparently discerned by lawyers and exploited by issuers who advertise such annuities as a means to qualify for Medicaid benefits. The definition of a loophole, however, is an "ambiguity, omission or exception that provides a way to avoid a rule without violating its literal requirements." *See* Black's Law Dictionary 954 (7th ed. 1999) (noting as example statutory provision that permits one to "legally avoid" taxes).

The practice is inconsistent with an apparent purpose of the MCCA and indeed the whole thrust of the Medicaid pro-

gram which is to provide assistance to those truly in need. It has no doubt frustrated not only the DPW but also program administrators in other states. As at least one neighboring state has apparently acknowledged, however, the practice is permissible under existing federal law. Indeed, the New Jersey Department of Human Services has permitted community spouses who mistakenly believed that assets transferred to an annuitized trust would not be countable in determining Medicaid eligibility for the institutionalized spouse to convert the trusts into commercial annuities to qualify for benefits. *See Johnson,* 91 F.Supp.2d at 764–65. *See also Pacente v. Jindal,* 751 So.2d 343, 346–47 (La.Ct.App. 1999) (holding denial of Medicaid benefits pursuant to § 1396p(c)(2)(B) and corresponding state regulation based on transfer of annuity by institutionalized spouse to community spouse for her sole benefit was improper although it was apparent such transfer was made to qualify for benefits).[16]

---

to "the projected return" but apparently only in assessing whether the investment will be recouped within the life of the beneficiary. The court agrees with the DPW that actuarial soundness and fair market value are conceptually distinct. If an annuitant receives the amount invested during his lifetime, the annuity is actuarially sound and for his sole benefit. If the annuity, however, provides a return of 1% when other issuers are offering 3%, it could be argued that the purchase was not literally for fair market value. In any event, the 2.5% return on the annuities in question appears to be within the range offered by other issuers and the DPW expressly found a transfer for fair market value. The DPW also has not disputed that the annuities are actuarially sound.

15. Defendant makes much in her brief of the MCCA provisions creating a minimum monthly maintenance needs allowance ("MMMNA") for the community spouse. *See* 42 U.S.C. § 1396r–5(d); 55 Pa.Code § 181.452(d)(2).

These provisions, however, played no part in the DPW's Adjudication and have no bearing on plaintiff's Medicaid eligibility. The MMMNA represents a predetermined minimum amount of income deemed necessary for the community spouse's subsistence. To the extent the community spouse's actual income falls below the MMMNA, the institutionalized spouse may designate to the community spouse a portion of his or her income that otherwise would have to be used to pay for nursing care expenses. The MMMNA does not limit an institutionalized spouse's eligibility based upon income of the community spouse which is not deemed to be available to the institutionalized spouse.

16. Defendant has cited no case and the court has found none in which a court has upheld a penalty or finding of ineligibility based on a transfer of assets to purchase an irrevocable actuarially sound commercial annuity at fair market value for the sole benefit of a spouse, regardless of the intent of the transferor. As

It is not the role of the court to compensate for an apparent legislative oversight by effectively rewriting a law to comport with one of the perceived or presumed purposes motivating its enactment. It is for the Congress to determine if and how this loophole should be closed.[17]

It thus appears likely that plaintiff will prevail on her claim that she was penalized and denied eligibility for a transfer of assets pursuant to a state practice or plan provision which is inconsistent with current federal Medicaid law.

■ Plaintiff has not, however, shown that she will be irreparably harmed if this case proceeds to resolution on the merits without a grant of temporary or preliminary injunctive relief. It is uncontroverted that plaintiff faces no prospect of expulsion from her nursing home prior to the resolution of this litigation. Also, defendant has agreed to make retroactive any benefits to which plaintiff is held to be entitled. Plaintiff suggests that this commitment may be unenforceable since a state official may not waive Eleventh Amendment immunity.

■ It is true that the Eleventh Amendment precludes an award of retroactive payments by a federal court. *See*

*Edelman,* 415 U.S. at 678, 94 S.Ct. 1347. It is also true that absent express authorization in state law, a state official may not waive a state's Eleventh Amendment immunity. *See Ford Motor Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 468, 65 S.Ct. 347, 89 L.Ed. 389 (1945). It does not follow, however, that the agreement would be unenforceable. *See Magnolia Venture Capital Corp. v. Prudential Sec'ys. Inc.,* 151 F.3d 439, 443 (5th Cir. 1998) (discussing distinction between Eleventh Amendment immunity and state sovereign immunity).

The promise to pay retroactively any benefits to which plaintiff is held entitled in exchange for the preservation of resources which would otherwise be expended in further litigating plaintiff's motions, and in an effort to recoup payments should preliminary relief be granted and defendant ultimately prevail on the merits, would appear to be a valid agreement. Pennsylvania has waived sovereign immunity for claims sounding in contract. *See Seeney v. Kavitski,* 866 F.Supp. 206, 210 (E.D.Pa.1994); *Shovel Transfer & Storage, Inc. v. Simpson,* 523 Pa. 235, 565 A.2d 1153, 1155 (1989); *McKeesport Mun. Water Auth. v. McCloskey,* 690 A.2d 766, 774 (Pa.Commw.1997).[18]

noted, the Commonwealth Court in *Bird* and *Dempsey,* relied upon by the DPW in its Adjudication, found an absence of fair market value. Two additional Commonwealth Court cases on which the DPW subsequently relied in its brief after litigation was initiated are wholly inapposite. Each involved a transfer of assets by an institutionalized individual to a child in return for an unassignable unsecured note at below market interest for a number of years which automatically cancelled upon the death of the transferor prior to the maturity date. The Court in each case concluded that the DPW correctly found these transfers were for less than fair market value and indeed referred to the "absurdity" of attempting to characterize them as fair market transactions. *See Ptashkin v. Department of Public Welfare,* 731 A.2d 238, 245 (Pa.Commw.1999); *Pyle v.*

*Department of Public Welfare,* 730 A.2d 1046, 1050 (Pa.Commw.1999).

17. If Congress wishes to make intent the touchstone in the evaluation of all transfers, it can revise the transfer provisions to penalize any transfer during the look back period found to have been made for the purpose of qualifying for Medicaid. If Congress wants to deter such transfers, it could revise the CSRA scheme to provide for the inclusion of any asset which would have been available but for a transfer found to have been made for the purpose of achieving eligibility.

18. Insofar as plaintiff declines to accept the DPW's offer, it is she who would have created the risk of loss of any interim benefits. It

Defendant has agreed to make plaintiff eligible for benefits retroactively should she prevail on the merits. Should preliminary injunctive relief be granted and defendant then prevail on the merits, defendant would bear the risk of losing the sums paid in the interim and the cost of attempting to recoup them. In these circumstances, defendant bears a greater risk of harm from a grant of interim relief. As these are public funds, the public interest is best served by deferring in these circumstances until adjudication on the merits.

### VI.  *Conclusion*

Consistent with the foregoing, the court will exercise jurisdiction and will deny plaintiff's request for interim injunctive relief. The court will afford the parties an opportunity to take such discovery as may be relevant on an expedited basis and then proceed promptly to a final adjudication on the merits.

An appropriate order will be entered.

### *ORDER*

**AND NOW,** this day of July, 2001, upon consideration of plaintiff's request for a temporary restraining order and Motion for Preliminary Injunction, and defendant's response thereto, consistent with the accompanying memorandum, **IT IS HEREBY ORDERED** that the request and the Motion are **DENIED.  IT IS FURTHER ORDERED** that the parties shall have until August 20, 2001 to conduct any discovery and this case will then be promptly listed for disposition on the merits.

may also be noted that plaintiff, who could have presented her claim to a state court which clearly could have awarded retroactive relief, instead elected to proceed in a federal forum by which she incurred the risk against which she then sought to be protected. In any event, given the paucity of pertinent facts and the limited time needed for any discovery, plaintiff's request for permanent injunctive relief should be resolved shortly.